UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ARTISTS RIGHTS ENFORCEMENT CORP.,

                       Plaintiff,

           -v -                          16-CV-1121 (JPO)

THE ESTATE OF BENJAMIN E. KING        OPINION AND ORDER
p/k/a BEN E. KING, by its duly appointed
administrator TERRIS CANNON, *et al.*,

                     Defendants.
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      Plaintiff Artists Rights Enforcement Corporation ("AREC") brings suit against the Estate of Benjamin E. King, personally known as Ben E. King, by its administrator Terris Cannon (the "Estate"), as well as Betty King, Terris Cannon (in his personal capacity), Benjamin E. King, and Angela Matos (the "King Family") (collectively, "Defendants"), seeking declaratory and injunctive relief to enforce two contracts between AREC and the deceased, Ben E. King. Defendants move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Dkt. No. 19.)  For the reasons that follow, the motion is granted in part and denied in part.

**I.    Background**

      The following facts, unless otherwise noted, are taken from the complaint (Dkt. No. 1 ("Compl.")), and are presumed true for the purposes of this motion.

      Ben E. King was a renowned musician, best known as the singer and co-writer of "Stand By Me," which broke the top ten in the charts in 1961 and 1986 and is considered one of the top "Songs of the Century." (*Id.* ¶ 3.)  He also co-wrote "There Goes My Baby." (*Id.* ¶ 11.)  Both

"Stand By Me" and "There Goes My Baby" (collectively, the "King Songs"), are the subject of valid copyrights.  (*Id.*)

On July 31, 2014, King executed a letter, memorializing an agreement with AREC regarding the prospective sale of the rights to the King Songs (the "Sale Agreement").  (*Id.* ¶ 12; Dkt. No. 20-3.)  The Sale Agreement provides, in relevant part:

> The work we have agreed you will perform for me will include (a) administering, as more specifically set forth below, my share(s) of the United States copyrights in the songs referenced above as may be recovered for me by my attorneys and/or (b) negotiation of the sale of my shares of the United States copyrights in any recovered songs referenced above as I may determine that I wish to sell.

(Compl. ¶ 13; Dkt. No. 20-3 at 2.)  The Sale Agreement further details the terms of AREC's contingent fee in exchange for these services (Compl. ¶ 14):

> [Y]ou will be entitled to receive ten percent (10%) of the total amount I receive from the sale of each share of the United States copyright in each recovered song I co-wrote that you arrange to sell.  However, if I, at my sole option, decide to keep my ownership share of any or all of such recovered songs rather than sell them, you shall be entitled to receive ten percent (10%) of my ownership share and ten percent (10%) of all monies I receive as co-publisher of the recovered song or songs . . . .

(Dkt. No. 20-3 at 2.)  Finally, the Sale Agreement appointed AREC as King's attorney-in-fact for these purposes and stated that if King "want[ed] to conduct an audit" in the future, AREC would "recommend a royalty auditor for [him] to use," whom he could accept or reject.  (Compl. ¶¶ 15-16; Dkt. No. 20-3 at 2-3.)

Shortly after executing the Sale Agreement, on August 1, 2014, and September 3, 2014, King served termination of transfer notices for the songs "There Goes my Baby" (for which an amended notice was served on August 22) and "Stand By Me," respectively (the "Termination Notices" or "Notices").  (Compl. ¶¶ 22-23; Dkt. No 20-1; Dkt. No. 20-2.)  The Notices also listed parties whose transfer rights would be terminated, including Sony/ATV Tunes, LLC ("Sony/ATV").  (Dkt. No. 20-1 at 3; Dkt. No. 20-2 at 3.)  According to the operative Notices, the

effective date for the termination of transfer was August 31, 2016, for "There Goes My Baby" (Dkt. No. 20-1 at 4) and will be April 18, 2017, for "Stand By Me" (Dkt. No. 20-2 at 5).

On December 15, 2014, King and AREC executed a second letter, in which King retained AREC's "professional services" to begin an audit of Sony/ATV "regarding royalties previous paid" for the King Songs (the "Audit Agreement"). (Dkt. No. 20-4 at 2; *see* Compl. ¶ 17.) The Audit Agreement provides that AREC "will retain the accounting firm of Prager Metis to perform the audit and shall advance, at [AREC's] sole risk, all of the costs of the audit" and makes clear that AREC will provide the series "on a purely contingent basis after recovery of [the] recoupable costs; that is [AREC] shall be entitled to receive thirty three and one third percent (33 1/3%) of the net amount" recovered from Sony/ATV. (Dkt. No. 20-4 at 2.) The Audit Agreement also states that King was "retaining" several lawyers "in connection with the matters hereunder." (*Id.*)

On January 9, 2015, pursuant to the Audit Agreement, AREC retained Prager Metis to start an audit of Sony/ATV. (Compl. ¶ 19.) In April 2015, per the terms of the Sale Agreement, AREC negotiated the sale of "certain rights" in the King Songs to Music Sales Group. (*Id.* ¶ 18.)

King died on or about April 30, 2015. (*Id.* ¶ 25.) Six months later, the King Family retained legal counsel to terminate the Sale Agreement and the Audit Agreement (collectively, the "Agreements"). (*Id.*) The King Family's counsel also notified "third parties with whom AREC was negotiating" that the Agreements were "not enforceable" and instructed Prager Metis to "cease communications with AREC." (*Id.* ¶¶ 25, 27, 28.) Around November 2015, the King Family's lawyers "demand[ed] that the audit be discontinued" and told AREC that the Agreements were terminated. (*Id.* ¶ 27.) AREC alleges that the King Family violated AREC's grant of rights in the King Songs and ultimately aimed to "create a bidding war for the King

3

Songs and then capitalize on AREC's work . . . for their own financial benefit and gain." (*Id.* ¶¶ 26, 29.)

On February 12, 2016, AREC filed the instant lawsuit. (*See* Compl.) AREC seeks a declaratory judgment that "the Agreements continue in full force and effect." (*Id.* ¶ 37.) AREC further seeks an injunction to prevent Defendants from "dishonoring the contractual obligations" under the Agreements, making claims to AREC's interests in the songs, or otherwise denying AREC's rights and privileges under the Agreements. (*Id.* ¶ 45.) Defendants, in turn, moved to dismiss the action under Federal Rule of Civil Procedure 12(b)(6). (*See* Dkt. No. 19.)

## II.     Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Iqbal*, 556 U.S. at 678). In determining whether this standard is satisfied, courts assume that all "factual allegations contained in the complaint" are true, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007), and "draw all inferences in the light most favorable to the non-moving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (citation omitted).

## III.    Discussion

AREC seeks declaratory and injunctive relief to deem the Agreements valid and to prevent Defendants from "dishonoring" their terms. (Compl. at 11.) Defendants argue that the claims should be dismissed as a matter of law because: (1) the Sale Agreement is invalid and

thus unenforceable; and (2) the Audit Agreement was automatically terminated when King died or else was validly terminated by Defendants.  The Court first analyzes the Sale Agreement, and then turns to the Audit Agreement.

### A.     The Sale Agreement

Defendants suggest that AREC's claim seeking to deem valid the Sale Agreement fails as a matter of law because, in direct contravention of the Copyright Act, the Sale Agreement purports to transfer future copyright interests before the effective date of the corresponding Termination Notices.

The Copyright Act gives authors the right to terminate the grant of any transfer or license made prior to 1978, allowing them to recapture the copyright for an extended term.  *See* 17 U.S.C. § 304(c); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 284 (2d Cir. 2002).  The relevant provision also establishes the limitation that any "further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid *only if it is made after the effective date of the termination.*"  17 U.S.C. § 304(c)(6)(D) (emphasis added); *see Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 201-02 (2d. Cir. 2008).  The right is both absolute, 17 U.S.C. § 304(c)(5) ("Termination may be effected notwithstanding any agreement to the contrary, including an agreement . . . to make any future grant."), and inalienable, *see Marvel Characters*, 310 F.2d at 290 (citing *Stewart v. Abend*, 495 U.S. 207, 230 (1990)) ("[T]he clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract.").

Here, the Sale Agreement sets out the terms of King's retaining AREC to administer King's interest in the King Songs and to sell (as King directs) the rights to the King Songs.

(Compl. ¶ 13; Dkt. No. 20-3 at 2.)[1] *See Distribuidora de Discos Karen C. Por A. v. Universal Music Grp., Inc.*, No. 13 Civ. 7706, 2015 WL 4041993, at *3 (S.D.N.Y. July 2, 2015) (explaining that the "right to administer, collect royalties . . . , and assert legal claims and defenses" constitutes an interest in a copyright). AREC would receive ten percent of the sale price of recovered copyrights King chose to sell, or ten percent of the ownership of the copyrights King chose to keep, as well as the right to administer King's interests together with ten percent of any revenue King received as a publisher of the songs. (Dkt. No. 20-3 at 2.)

But at the time King executed the Sale Agreement, on July 31, 2014, the Termination Notices for the King Songs had not yet become effective; indeed they had not even been served. (*See* Dkt. No. 20-1; Dkt. No. 20-2.) The termination for "There Goes My Baby" became effective on August 31, 2016 (Dkt. No. 20-1 at 4), and the termination for "Stand By Me" will be effective on April 18, 2017 (Dkt. No. 20-2 at 5).

Because the promise of future rights contained in the Sale Agreement predated the effective dates of the Termination Notices (and predated even the service of the Notices), the contract contravenes the terms of the Copyright Act and is thus "invalid on its face." *Range Rd. Music, Inc. v. Music Sales Corp.*, 76 F. Supp. 2d 375, 380–81 (S.D.N.Y. 1999) (holding that a transfer of interest "conveyed nothing" because it was executed before the effective date of

---

[1] "[T]he Court is entitled to consider facts alleged in the complaint and documents . . . incorporated in it by reference, [or] documents 'integral' to the complaint and relied upon in it . . . ." *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014). In the complaint, AREC references the Sale Agreement (Dkt No. 20-3), the Audit Agreement (Dkt. No. 20-4) and the Termination Notices (Dkt. No. 20-1; Dkt. No. 20-2). (*See* Compl. ¶¶ 12-17, 22-24.) The Court is thus free to rely on these documents. *See also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995))).

termination). The Copyright Act's sole exception—which allows authors to grant or agree to make a further grant to the "original grantee or such grantee's successor in title, after the notice of termination has been served," 17 U.S.C. § 304(c)(6)(D)—does not apply, as the Termination Notices had not been served at the time of the Sale Agreement and AREC was not the original grantee or its successor. (*See* Dkt. No. 20-1; Dkt. No. 20-2.)

King could not convey or agree to convey a right or interest in the King Songs' copyrights to any third party at the time he signed the Sale Agreement,[2] so AREC's claims for a declaration stating the contract is valid or an injunction requiring Defendants to keep to its terms must fail as a matter of law.

### B. The Audit Agreement

Defendants also argue that the Audit Agreement automatically terminated upon King's death or, alternatively, that Defendants validly terminated it. (*See* Dkt. No. 19 at 12.) Both of Defendants' arguments rely on a finding, as a matter of law, either that the Audit Agreement is a personal services contract or that it established an agency relationship between King and AREC. (*Id.* at 12-13.) The Court thus turns to this threshold question—whether the Audit Agreement is, as a matter of law, a personal services contract or creates an agency relationship.

The central feature of a personal services contract is that the contract primarily entails the skill and labor of a particular individual. *See, e.g.*, *Steinbeck v. Steinbeck Heritage Found.*, 400 F. App'x 572, 579 (2d Cir. 2010) (citing *Buccini v. Paterno Const. Co.*, 253 N.Y. 256, 257-58 (1930) (Cardozo, J.)). In determining whether a contract is one for personal services, courts consider many factors, including: "[t]he importance of trust and confidence in the relation

---

[2] The Court need not, and does not, reach Defendants' argument, in the alternative, that the Sale Agreement was terminated.

between the parties, the difficulty of judging the quality of the performance rendered and the length of time required for performance." Restatement (Second) of Contracts § 367 cmt. b (1981). This inquiry can be "intensely fact oriented." *Zink Commc'ns v. Elliott*, No. 90 Civ. 4297, 1990 WL 176382, at *17 (S.D.N.Y. Nov. 2, 1990).

Contrary to Defendants' argument, it is not clear—on the face of the contract or from the pleadings—whether the Audit Agreement should be characterized as a personal services contract. It is true that the Audit Agreement has certain features of a personal services contract, including allusions to the relationship between King and AREC (for instance, it repeatedly references "I" (King) and "you" (AREC)). (Dkt. No. 20-4 at 2-3.) But the contract describes various tasks, including "retain[ing] . . . Prager Metis to perform the audit," "advanc[ing] . . . the costs of the audit," and providing separately for legal representation, that do not require the services of any particular individual. (*Id.* at 2.) Given this factual complexity, the Court cannot determine that the contract is one for personal services as a matter of law.

The Court is also unable to conclude, as a matter of law, that the Audit Agreement establishes an agency relationship between King and AREC. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003) (quoting Restatement (Second) of Agency § 1 (1958)). "Not all relationships in which one person provides services to another satisfy the definition of agency." Restatement (Third) Of Agency § 1.01 (2006). The question of whether an agency relationship exists is "a mixed question of law and fact," *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003), and the Court is obligated to "look to the substance of the relationship," *In re Nigeria Charter Flights Contract*

8

*Litig.*, 520 F. Supp. 2d 447, 461 (E.D.N.Y. 2007) (quoting *In the Matter of Shulman Transport. Enters., Inc.*, 33 B.R. 383, 385 (S.D.N.Y. 1983)).  To that end, it is not evident from the face of the Audit Agreement that an agency relationship existed between King and AREC.  *See Phoenix Cos., Inc. v. Abrahamsen*, No. 05 Civ. 4894, 2006 WL 2847812, at *6 (S.D.N.Y. Sept. 28, 2006) (finding that "express[] authoriz[ation]" to carry out sales, to act as a representative, and to contract for and compensate advisors are insufficient to establish an agency relationship as a matter of law).  The Court therefore cannot determine at this stage of litigation that, as a matter of law, an agency relationship was created.

Because the Court does not conclude as a matter of law that the Audit Agreement is a personal services contract or establishes an agency relationship, Defendants' arguments that the Audit Agreement terminated automatically at King's death or else was validly terminated by Defendants cannot be sustained.  AREC's claims as to the Audit Agreement therefore survive.

**IV.      Conclusion**

For the foregoing reasons, the motion to dismiss is GRANTED IN PART, with respect to the Sale Agreement, and DENIED IN PART, as regards the Audit Agreement.  Defendants shall respond to AREC's remaining claims on or before January 3, 2017.

The Clerk of Court is directed to close the motion at Docket Number 18.


SO ORDERED.


Dated: December 12, 2016
       New York, New York

_____
J. PAUL OETKEN
United States District Judge