UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ARTISTS RIGHTS ENFORCEMENT CORP., :
:
Plaintiff, :     Case No. 16-cv-01121 (JPO)
:
-against- :
:
THE ESTATE OF BENJAMIN E. KING, :     **DEFENDANTS' PROPOSED FINDINGS**
P/K/A BEN E. KING, BY ITS DULY :     **OF FACT AND CONCLUSIONS OF**
APPOINTED ADMINISTRATOR TERRIS :     **LAW**
CANNON, BETTY KING, TERRIS :
CANNON, BENJAMIN E. KING JR., and :
ANGELA MATOS :
:
Defendants. :
:
--------------------------------------------------------X

Defendants, the Estate of Benjamin E. King, p/k/a Ben E. King, by its duly appointed

Administrator Terris Cannon, Betty King, Terris Cannon, Benjamin E. King Jr., and Angela

Matos respectfully submit the following proposed findings of fact and conclusions of law in

accordance with Fed. R. Civ. P. 52.

## Proposed  Findings of Fact

1.      In this case, Plaintiff invites the Court to find the existence and enforceability of a

purported oral agreement pursuant to which Ben E. King authorized Plaintiff to sell Mr. King's

interest in the writers' share of royalties in "Stand By Me" and "There Goes My Baby."  Due to

the fact that the purported oral agreement is contrary to the express language of a written

agreement between Mr. King and Plaintiff, that Plaintiff never raised the existence of such an

oral agreement in either its original or first amended complaint, that the claim of an oral contract

was made only after this Court ruled that the written contract was unenforceable, that Mr. King

passed away and is unavailable to confirm or deny Plaintiff's unsupported claim, and that the

claim is contrary to all credible aspects of Plaintiff's president's testimony, now also deceased, the Court declines Plaintiff's invitation.

**Background**

2.      Ben E. King was a legendary singer and songwriter.  Among other things, Mr. King co-wrote the compositions "Stand By Me" and "There Goes My Baby" (the "Compositions"), both of which were enormously popular and commercially successful hits. Mr. King's interest in "Stand By Me," in particular his share of that song's copyright and songwriters' royalties, constitute the most valuable asset he left for his family upon his passing in April 2015.  DX D, E; T. Cannon Decl. ¶ 2.

3.      Mr. King was survived by his wife, Betty King, and three children, Terris Cannon, Benjamin E. King, Jr., and Angela Matos, all of whom are defendants in this action.  T. Cannon Decl. ¶ 2.

4.      Plaintiff Artist Rights Enforcement Corporation ("AREC") is a New York corporation that purports to assist artists and songwriters in collecting income and selling music-related intangible assets.  Charles Rubin was the founder and president of AREC until his death in April 2018.  G. Rubin Decl. ¶¶ 1, 3-6, 8; C. Rubin Dep. at 12:20-13:2.  At all times relevant to this case, Mr. Rubin owned 100% of AREC's common stock.  Subsequent to the commencement of this action, and two days prior to his deposition, Mr. Rubin transferred all of his AREC shares to his wife, Marcia Rubin, for no consideration.  DX OOO; Tr. 193:5-16; C. Rubin Dep. at 14:21-15:3.

**Procedural History**

5.      AREC initiated this litigation with the filing of its Complaint on February 2, 2016.  In both its Complaint and its First Amended Complaint, filed February 17, 2016, AREC

sought (i) a declaratory judgment that two written agreements entered into by Mr. King and AREC remained valid and enforceable against Defendants and (ii) an injunction prohibiting Defendants from violating the alleged contractual obligations.  The first agreement was executed on or about July 31, 2014 and concerned Mr. King's engagement of AREC to sell his post-termination copyrights in the Compositions (the "Termination Agreement"). The second agreement was executed on or about December 15, 2014 and concerned Mr. King's engagement of AREC to conduct a royalty examination of Mr. King's music publisher (the "Audit Agreement").  Dkt. 1, 17; PX 1, 2; DX B, J.

6.      Defendants moved to dismiss the First Amended Complaint on April 14, 2016, on the grounds, among other things, that the Termination Agreement was invalid and unenforceable, because, in contravention of the Copyright Act, 17 U.S.C. § 304(c)(6)(D), it purported to transfer future copyright interests before the effective dates of the corresponding termination notices. Dkt. 18, 19, 20.

7.      On December 12, 2016, this Court ruled that the Termination Agreement was "invalid on its face" and unenforceable under the above provision of the Copyright Act.  *Artists Rights Enf't Corp. v. Estate of King*, 224 F. Supp. 3d 231, 236 (S.D.N.Y. 2016).  As the Court noted, Mr. King "could not convey or agree to convey a right or interest in the [Compositions'] copyrights to any third party at the time he signed" the Termination Agreement.  *Id.*

8.      On February 6, 2017, AREC sought leave to file a Second Amended Complaint, alleging, for the first time, that Mr. King had entered into an oral agreement with AREC concerning Mr. King's engagement of AREC to sell his writers' royalties derived from the Compositions in exchange for a fee, and asserting a claim for breach of that oral agreement by Defendants.  Dkt. 43, 44, 45.  AREC further alleged in its Second Amended Complaint that Mr.

Rubin reported to Mr. King, in or about mid-December 2014, information concerning a potential sale to Music Sales Corporation ("Music Sales") and that Mr. King authorized Mr. Rubin to sell his share of future writers' royalties for at least the amount reported.  Dkt. 44 ¶ 28.  Over Defendants' opposition, this Court granted AREC's motion for leave to file the Second Amended Complaint on May 15, 2017.  *Artists Rights Enf't Corp. v. Estate of King*, 2017 WL 2062988, at *4 (S.D.N.Y. May 15, 2017).

9.     A bench trial was held on AREC's purported oral agreement and Audit Agreement claims on May 29 and 30, 2018.  During closing argument, AREC advanced yet another new theory of its case, claiming for the first time that the purported oral agreement was actually an oral modification of the written Termination Agreement, presumably to avoid application of the Statute of Frauds, discussed in the Conclusions of Law section *infra*.  *See* Tr. 219:10-220:3, 224:6-15, 226:3-15; Plaintiff's Requested Findings of Fact and Conclusions of Law ¶¶ 29-30 (Dkt. 117).

**The Unenforceable Written Termination Agreement and the Alleged Oral Agreement with Ben E. King**

10.     On or about July 31, 2014, Mr. King and Mr. Rubin executed the Termination Agreement, pursuant to which AREC would endeavor to sell Mr. King's post-termination copyright interests in the Compositions, in return for ten percent of the amount received from any such sale.  PX 1; DX B; Alter Decl. ¶ 3.

11.     The Termination Agreement expressly provided that under no circumstances would AREC be entitled to any portion of Mr. King's songwriters' royalties; "You [AREC] also agree that in no event will you be entitled to receive any portion of my [Mr. King's] writer royalties . . . ."  PX 1; DX B; Alter Decl. ¶ 3.

12.     AREC contends that on December 1, 2014, Mr. Rubin met with Mr. King and Mr. King's ostensible counsel, Peter Lane, at AREC's offices.  All of the witnesses to this alleged meeting died before trial in the instant action.  C. Rubin Dep. at 35:20-37:12, 297:19-298:3.

13.     AREC contends that at the December 1, 2014 meeting, Mr. Rubin advised Mr. King that a sale of his writers' royalties could generate millions of dollars.  C. Rubin Dep. at 36:11-19, 39:7-40:22.

14.     Mr. Rubin testified that, at this December 1, 2014 meeting, he told Mr. King that he could sell the writers' royalties derived from the Compositions in addition to the post-termination copyrights for at least $8 million in total.  Mr. Rubin further testified that Mr. King responded to this prediction by saying, "Please, go for it."  C. Rubin Dep. at 44:6-24, 46:18-25, 64:8-24.

15.     According to Mr. Rubin, he and Mr. King only discussed selling the post-termination copyrights together with the writers' royalties and they never discussed selling the writers' royalties alone.  C. Rubin Dep. at 48:23-49:7.

16.     During the course of two days of deposition, Mr. Rubin never testified that Mr. King had agreed to pay an additional fee for any sale of his writers' royalties alone, even though he was asked about his recollection of the December 1, 2014 meeting seventeen times.  See C. Rubin Dep. at 36:5-25, 38:17-24, 44:6-45:17, 46:10-17, 50:13-51:13, 52:21-53:6, 62:15-19, 63:3- 65:4, 116:10-119:25, 297:19-299:7, 414:2-6.

17.     Twenty-seven days after Mr. Rubin's deposition, AREC's counsel submitted an errata sheet, prepared by AREC's counsel and notarized by Mr. Rubin's daughter, an AREC employee and officer, which added testimony that "He [Mr. King] also agreed to the 10% fee on the sale of the writers' royalties."  No explanation was provided for this change on the errata

sheet in violation of Federal Rule of Civil Procedure 30(e), which requires the deponent to sign a statement listing not only the changes, but also the reasons for making them.  Mr. Rubin was never subject to cross-examination regarding this new testimony.  DX UUU.

18.     There is no documentary evidence corroborating AREC's claim that an oral agreement was made with Mr. King on December 1, 2014, and the documentary evidence in the record belies any such conclusion.

19.     Indeed, during this same December 1, 2014 meeting when AREC contends an oral contract was made, Mr. Rubin and Mr. King did discuss entering into two new written contracts; the first expanding the scope of AREC's work to include a royalty examination of Mr. King's music publisher, Sony/ATV Music Publishing ("Sony/ATV"); the second, the collection of digital performance royalties from the organization SoundExchange.  C. Rubin Dep. at 49:8-51:13, 52:21-53:24.  Both of these arrangements, but not the purported agreement to sell Mr. King's writers' share, were set forth in signed, written contracts.  PX 2, 3; DX J.

20.     On December 2, 2014, the day after his meeting with Mr. King, Mr. Rubin sent an email to AREC's lawyer, Ross Charap, outlining the new Ben E. King retainers and asking Mr. Charap to prepare written contracts.  Mr. Rubin made no mention whatsoever of any oral agreement with Mr. King concerning the sale of his writers' share.  DX G.  Indeed, Mr. Rubin never told Mr. Charap or anyone else about this purported oral agreement.  Tr. 35:22-36:3.

21.     On December 2, 2014, Mr. Rubin sent a confirmatory letter to Mr. King, stating he was "glad we finally met in person about our endeavors to assist you with your termination rights . . . ."  Again, Mr. Rubin said nothing about the alleged oral agreement concerning the sale of Mr. King's songwriters' royalties or paying a fee to AREC in the event of such a sale.  DX H.

22.     Mr. Rubin testified that AREC's role in attempting to sell Mr. King's assets was to provide know-how and expertise for what could be relatively complicated deals, based on Mr. Rubin's extensive industry experience, and that brokering such deals represented a significant business opportunity to potential bidders such as Music Sales.  C. Rubin Dep. at 301:4-303:7.

23.     Despite AREC's self-proclaimed expertise and contacts in the music industry, its efforts to identify potential buyers under the Termination Agreement were limited to its dealings with Music Sales.  Mr. Rubin did not explore interest from any other publisher.  *See* C. Rubin Dep. at 66:18-67:9, 74:8-11.

24.     On March 18, 2015, Mr. Rubin attempted to communicate with Mr. King by emailing Mr. King's daughter, Terris Cannon.  In this email, Mr. Rubin claims to have met with Music Sales and received an oral offer of approximately $9.3 million for the Compositions, "[b]oth for U.S. termination and song sale."  PX 7; DX O; C. Rubin Dep. at 174:8-176:7. However, John Castaldo, Music Sales' CFO and Mr. Rubin's point of contact, did not recall ever making such an oral offer.  Castaldo Decl. ¶¶ 12, 14; Tr. 78:14-21.

25.     There is no evidence that Mr. King ever received or responded to Mr. Rubin's March 18, 2015 email regarding the Music Sales offer.

26.     Although AREC now contends that this purported oral offer from Music Sales for "U.S. termination and song sale" included a sale of Mr. King's future songwriters' royalties, even AREC's own lawyer, Mr. Charap, who was copied on Mr. Rubin's March 18, 2015 email, understood that the alleged offer, as communicated by Mr. Rubin, excluded songwriters' royalties.  DX P; Charap Decl. ¶ 20; Tr. 51:5-52:11.

27.     On April 2, 2015, Mr. King was admitted to Hackensack University Medical Center, where he remained until he passed away on April 30, 2015.  Early in the morning of

April 20, 2015, Mr. King developed batwing pulmonary edema and required tracheal intubation, meaning a plastic tube was inserted into Mr. King's trachea to maintain an open airway and prevent asphyxiation.  Mr. King remained intubated and heavily sedated from this point until his passing, and was semi-comatose and unable to communicate verbally during this period.  DX V; Berkowitz Aff. ¶¶ 2-4; T. Cannon Decl. ¶¶ 3, 7-8.

28.     While Mr. King lay dying in the hospital, Mr. Rubin, Mr. Charap, and Mr. Lane, an attorney who purportedly represented Mr. King, were engaged in a dispute amongst themselves regarding the division of fees they would receive from AREC's agreements with Mr. King.  PX 13; DX Q, W, Y, BB, CC, EE; Charap Decl. ¶¶ 22-24; Tr. 41:17-19, 47:19-48:6, 57:1-18, 59:3-60:5.

29.     On April 15, 2015, after Mr. King had already been admitted to the hospital, Mr. Rubin solicited a written offer letter from Mr. Castaldo for the purchase of the Compositions. Mr. Rubin specifically asked Music Sales for a formal offer that could be countersigned by Mr. King.  DX R.

30.     On April 17, 2015, Mr. Castaldo responded to Mr. Rubin's solicitation and sent a written offer letter proposing to pay $6.7 million for Mr. King's writers' share in the Compositions and $1.5 million for the post-termination copyrights, for a total offer of $8.2 million.  PX 6; DX S; Castaldo Decl. ¶ 12.  Although Mr. Rubin had requested a formal offer that could be countersigned by Mr. King, Mr. Castaldo declined and made the offer "subject to a written contract and full financial and copyright due diligence."  Among other things, Music Sales had not yet seen the songwriters' agreements for the Compositions at the time its conditional, preliminary offer was made.  PX 6; DX S, OO; Tr. 77:16-78:10, 83:13-84:11.

31.     Although the April 17, 2015 Music Sales conditional offer letter did not specify a time for consummating the transaction, any agreement in 2015 would have been prior to the effective dates of termination for the Compositions.  DX D, E; Castaldo Decl. ¶ 8; Tr. 75:8-14, 76:5-8.  While AREC claims that it homed in on Music Sales as a potential buyer in part because Music Sales was willing to pay for the last two years of the Compositions while Sony/ATV still owned them, this claim only confirms the fact that the Music Sales offer was unlawful under the Copyright Act, because it demonstrates that Music Sales was attempting to buy the copyrights prior to the effective termination dates.  *See* Plaintiff's Requested Findings of Fact and Conclusions of Law ¶ 56.

32.     There is no evidence that Music Sales conducted full financial and copyright due diligence or that a written contract was prepared, much less executed.  AREC's attempt to modify, explain, or otherwise amend the plain language of the April 17, 2015 Music Sales offer letter is not credible, and AREC's argument that full due diligence would not have produced adverse information is both incompetent speculation and contrary to Mr. Castaldo's testimony. *See* Plaintiff's Requested Findings of Fact and Conclusions of Law ¶¶ 68-69; Tr. 77:16-78:10, 82:14-83:2.

33.     Music Sales' April 17, 2015 conditional offer letter was neither communicated to nor accepted by Mr. King.  T Cannon Decl. ¶ 9; C. Rubin Dep. at 151:19-152:12; 359:24-360:3. Given that Mr. King never received the offer letter, was hospitalized, and there is no evidence that he discussed the offer letter with Mr. Lane, AREC's claim that Mr. King, through Mr. Lane, approved the offer is not credible.  *See* Plaintiff's Requested Findings of Fact and Conclusions of Law ¶ 73.

34.     At the time Mr. Rubin received Music Sales' conditional offer letter, due to the ongoing fee dispute between him and Mr. Lane, Mr. Rubin had not spoken to or communicated with Mr. King in more than a month.  DX T, W; C. Rubin Dep at 151:19-152:2.  On April 20, 2015, Mr. Charap, at Mr. Rubin's direction and with his approval, attempted to contact Mr. King, by emailing Ms. Terris Cannon, to discuss the Music Sales conditional offer and other matters. PX 25; DX T, U; C. Rubin Dep. at 360:6-18; Tr. 41:13-42:1.

35.     The April 20, 2015 email from Mr. Charap demonstrates that both Mr. Rubin and Mr. Charap thought the $8.2 million offer from Music Sales was too low to accept and was only a negotiating ploy by Music Sales.  PX 25; DX T; Tr. 48:13-20, 55:11-56:4.

36.     The April 20, 2015 email from Mr. Charap again demonstrates that Mr. Rubin never told Mr. Charap about an oral agreement to sell Mr. King's writers' royalties alone in exchange for a fee, because Mr. Charap states that Mr. Rubin told him only that Mr. King had "expressed interest in finding out what your writer royalties might bring if you sold them along with the recaptured shares of" the Compositions.  PX 25; DX T; *see* Tr. 35:22-36:3, 56:5-8.

37.     The April 20, 2015 email from Mr. Charap demonstrates that Mr. Charap was aware that Mr. King had been questioning Mr. Rubin's integrity in business dealings; Mr. Charap stated, "I also understand that you told Chuck [Mr. Rubin], the last time you and he spoke, that someone had told you that Chuck could not be trusted and that he had cheated a client."  PX 25; DX T; Tr. 42:2-8.

38.     The conditional Music Sales offer was never accepted by Mr. King.  *See* DX AA; Tr. 48:10-12, 56:9-25.

39.     Mr. Castaldo's testimony that the Music Sales offer was intended to encompass two transactions, one for the immediate purchase of Mr. King's songwriters' royalties and one

for the purchase of Mr. King's copyright shares subsequent to the effective dates of termination in 2017, is belied by the written terms of the very same offer letter, which makes no mention of any such structure or delay in consummating the full transaction.  PX 6; DX S; Castaldo Decl. ¶ 9; Tr. 77:4-13.  In any event, there is no evidence that Mr. Castaldo's after-the-fact interpretation of the Music Sales offer letter was ever communicated to Mr. King.

40.     On April 28, 2015, while Mr. King was semi-comatose in the hospital and just two days before he passed away, Mr. Rubin, both individually and on behalf of AREC, Mr. Charap, and Mr. Lane executed a contingent fee-sharing agreement concerning Mr. King's Compositions.  The contingency set forth in this letter agreement establishes that as of April 28, 2015, Mr. King and AREC had yet to reach any agreement about the fees AREC would receive if, among other things, Mr. King decided to sell his songwriters' royalties.  PX 15; DX EE. Indeed, if Mr. Rubin's errata sheet testimony is to be believed – that Mr. King and Mr. Rubin reached such an agreement orally on December 1, 2014 – there would have been no contingency.

41.     AREC never produced the April 28, 2015 fee-sharing agreement during discovery, notwithstanding the fact that it is printed on AREC letterhead and that Mr. Rubin signed it twice.  *See* PX 15; DX EE.

42.     On April 28, 2015, Mr. Rubin, still unaware of Mr. King's grave condition, emailed Mr. Castaldo seeking to schedule a meeting "to make the sale happen," which meeting was ultimately scheduled for May 5, 2015.  PX 8.  Based on the record evidence, it is more likely that Mr. Rubin sought this meeting in order to solicit an increased firm offer from Music Sales to then present to Mr. King.  The fact that Mr. Rubin proposed this meeting further supports the preliminary nature and inadequacy of the April 17, 2015 Music Sales offer letter.

43. Despite AREC's claim that Mr. Rubin and Mr. Castaldo expected Mr. King to be present at the May 5, 2015 meeting, there is no record evidence indicating that Mr. King was invited to attend and Mr. King is not even mentioned in the emails between Mr. Rubin and Mr. Castaldo scheduling the meeting. To the contrary, Mr. Rubin stated only that he would attend, making no mention of Mr. King or his representatives; Mr. Rubin simply stated, "Big John – *I'll be there*." PX 8 (emphasis added); *see* Plaintiff's Requested Findings of Fact and Conclusions of Law ¶ 39. Presumably, if Mr. Rubin had attempted to include Mr. King and determine his availability, he would have learned that Mr. King was hospitalized and semi-comatose.

44. Following Mr. King's death, no one from his family communicated with AREC, Mr. Rubin, or Mr. Charap, or responded to Mr. Charap's emails to Ms. Jeniece Cannon and Ms. Terris Cannon. DX AAA, FFF.

45. AREC never claimed that an oral agreement had been entered into with Mr. King concerning the sale of his writers' royalties derived from the Compositions in exchange for a fee until February 6, 2017, when, following this Court's ruling that the Termination Agreement was invalid and AREC's retention of new counsel, AREC moved for leave to amend its complaint a second time, which motion this Court granted on May 15, 2017. Dkt. 43, 44, 45, 65; *see* Alter Decl. ¶¶ 8, 10; Tr. 56:5-8, 66:7-15.

46. Neither Mr. King nor Defendants ever consummated any of the transactions urged by AREC and Mr. Charap with respect to the Compositions. Music Sales never acquired any rights in the Compositions or to Mr. King's writers' royalties derived from the Compositions. *See* Tr. 56:9-25, 85:2-86:5; C. Rubin Dep. at 145:14-21.

**The Sony/ATV Audit and SoundExchange Agreement**

47.     On or about December 15, 2014, Mr. King and Mr. Rubin executed the Audit Agreement, pursuant to which AREC would hire an accountant to conduct a royalty examination of Sony/ATV on Mr. King's behalf.  The Audit Agreement provided that AREC would retain the accounting firm Prager Metis CPAs, LLC ("Prager Metis") to perform the royalty examination regarding royalties previously paid on the Compositions, and expressly specified that AREC "shall advance, at [its] sole risk, all of the costs of the audit."  In exchange, AREC would be entitled to a contingent fee of one-third of any amount recovered from Sony/ATV based on the royalty examination.  PX 2; DX J; Alter Decl. ¶ 4.

48.     The Audit Agreement, drafted by Mr. Charap, further provided that Mr. King was retaining Mr. Charap as his attorney in connection with the matters thereunder, but specified that AREC would be responsible for the payment of all legal fees from AREC's contingent recovery. PX 2; DX J; Tr. 25:24-26:11.  The Audit Agreement contains no provision purporting to bind Mr. King's successors or heirs and was not signed by any member of Mr. King's family.  PX 2; DX J.

49.     On or about December 15, 2014, Mr. King and Mr. Rubin also executed an agreement pursuant to which AREC would assist Mr. King in registering with and collecting digital performance royalties from SoundExchange (the "SoundExchange Agreement").  The SoundExchange Agreement provided that, in consideration, AREC would be entitled to a contingent fee of twenty percent of any amount collected from SoundExchange.  PX 3.

50.     The SoundExchange Agreement, also drafted by Mr. Charap, provided that Mr. King was retaining Mr. Charap as his attorney, but again specified that AREC would be

responsible for the payment of all legal fees from AREC's contingent recovery.  PX 3; Tr. 26:12-18.

51.     As AREC concedes, the SoundExchange Agreement became moot when AREC learned that Mr. King was already registered with SoundExchange and receiving his digital performance royalties.  C. Rubin Dep. at 483:23-484:23; *see* Plaintiff's Requested Findings of Fact and Conclusions of Law ¶ 53.  This concession makes it even less likely that AREC would have chosen to memorialize in writing a worthless agreement while not preparing a written agreement for the much more valuable alleged deal to sell Mr. King's writers' royalties in exchange for a fee.

52.     On or about January 9, 2015, pursuant to the Audit Agreement, AREC retained Prager Metis to conduct the Sony/ATV royalty examination.  J. Christopher Hull, a Prager Metis partner, headed the work on the Sony/ATV royalty examination.  DX M; Tr. 149:23-150:1.

53.     At the time Mr. King died on April 30, 2015, very little work had been done by Mr. Hull and Prager Metis in connection with the Sony/ATV royalty examination.  C. Rubin Dep. at 221:4-9; Tr. 148:18-149:13, 151:4-7, 165:3-19.

54.     Neither Mr. Rubin nor Mr. Charap made any effort to determine whether Mr. King's family wished to continue with the Sony/ATV royalty examination after Mr. King's passing.  DX AAA, FFF.

55.     Although AREC failed to either produce in discovery or enter into evidence Prager Metis time sheets demonstrating when time charges were incurred, the vast majority of work on the royalty examination was performed beginning in July 2015, several months after Mr. King had passed away.  Tr. 150:2-5, 153:4-9, 165:13-19.

56.     AREC failed to submit evidence demonstrating payment of the vast majority of the amount billed by Prager Metis for the Sony/ATV royalty examination.  *See* PX 28.

57.     After conducting the royalty examination of Sony/ATV, Mr. Hull and Prager Metis concluded that any of the identified potential items of underpayment to Mr. King could be substantially outweighed by much larger items of potential overpayment, meaning it would likely not be worth pursuing the completion of the royalty examination, because there was a substantial risk, in Mr. Hull's opinion, that no monies would be due to Mr. King or that Sony/ATV would take the position that he had been overpaid.  Mr. Hull communicated this opinion to both AREC and Lisa Alter, an attorney retained by the King family.  DX LLL; Alter Decl. ¶ 6; Charap Decl. ¶ 30; Tr. 155:24-159:9, 160:18-162:7, 188:13-189:25.

58.     On November 2, 2015, Ms. Alter informed Mr. Rubin and Mr. Charap that the family no longer wished to retain AREC's services as administrator of the Compositions or in connection with the Sony/ATV royalty examination or any sale of the Compositions.  Ms. Alter demanded that AREC, Mr. Rubin, and Mr. Charap immediately cease holding themselves out as authorized representatives of Mr. King, his estate, and/or his family, as well as deliver to her all documents and files in their possession relating to the Compositions and/or the Sony/ATV royalty examination.  PX 23, 24; Alter Decl. ¶¶ 1, 5; Tr. 63:12-18.

59.     On November 17, 2015, Ms. Alter instructed Mr. Hull to cease work on the Sony/ATV royalty examination on behalf of the King family and Mr. King's estate.  DX III; Alter Decl. ¶ 6; Tr. 63:19-21, 162:8-12.

60.     Mr. Rubin refused to follow the instruction of Ms. Alter on behalf of the King family and continued to proceed with purported efforts to sell Mr. King's Compositions and

audit Sony/ATV on his behalf, including directing Mr. Hull to complete work on the royalty examination.  Alter Decl. ¶¶ 7, 9-10; Charap Decl. ¶ 29; Tr. 63:22-65:5, 164:20-24.

61.    Mr. Hull declined to follow Ms. Alter's instruction to cease the royalty examination.  Tr. 162:8-163:7.

62.    To the extent that Mr. Hull required documents or information from Mr. King, his family, or his representatives, he was never denied any access or information by them.  Tr. 149:16-19, 151:8-10, 155:14-18.

63.    Regardless of whether Ms. Alter or the King family were entitled to instruct Mr. Hull to cease working, nothing they said or did prevented Mr. Hull and Prager Metis from completing their work on the Sony/ATV royalty examination.  Tr. 163:1-14, 186:25-187:2.

**The Credibility of Mr. Rubin's Testimony**

64.    Unbeknownst to Mr. King previously, from the outset of his dealings with AREC, Mr. Rubin was secretly entering into a series of side agreements with Mr. King's manager, Randy Irwin, whereby AREC would share a portion of its fees with Mr. Irwin, in exchange for "consulting services."  DX C, CC; C. Rubin Dep. at 161:12-162:16, 308:9-309:10.

65.    When questioned at his deposition, Mr. Rubin denied the existence of the Irwin side agreements.  C. Rubin Dep. at 75:16-76:6, 92:3-7.  However, when confronted with incontrovertible documentary evidence that AREC had withheld from its production, Mr. Rubin acknowledged that he had done so and never informed Mr. King of these arrangements.  C. Rubin Dep. at 91:19-95:3.

66.    When Mr. Charap emailed Mr. King (via Ms. Terris Cannon) on April 20, 2015, to discuss the Music Sales offer and other matters, Mr. Charap impugned the integrity of Mr. Lane, saying he "appears to be more concerned about his share of the commission on this deal . .

. than whether the deal is completed for your great benefit." Mr. Charap recommended instead that Mr. King seek advice from Mr. Irwin regarding the Music Sales offer. PX 25; DX T; Tr. 42:13-20, 57:1-18.

67.    Mr. Charap testified that, at the time he sent the April 20, 2015 email to Mr. King, he was unaware of the side agreements entered into by Mr. Rubin and Mr. Irwin. Tr. 42:21-43:19. He further testified that, had he known about the Irwin side agreements at the time, he would not have recommended that Mr. King seek advice from Mr. Irwin, because Mr. Charap considered the Irwin side agreements to be an unethical conflict of interest. *Id.*

68.    However, Mr. Charap was aware of the Irwin side agreements at the time he sent the April 20, 2015 email, because Mr. Rubin had emailed Mr. Charap the details of the Irwin side agreements on April 2, 2015, eighteen days before Mr. Charap sent the email suggesting that Mr. King seek advice from Mr. Irwin. DX C; Tr. 43:20-45:2.

69.    Mr. Lane, who was copied on the April 20, 2015 email from Mr. Charap, responded to Mr. Charap and characterized the email as "underhanded," "highly unprofessional," "extremely offensive," and "perhaps, even libelous." DX W; Tr. 45:14-46:4, 46:22-47:8.

70.    Mr. Charap, again with Mr. Rubin's approval, responded by telling Mr. Lane he would receive his "Finder's Fee" and should "[s]tep out of the way and let us move this deal forward." DX W.

71.    Additionally, at the same time Mr. Rubin was attempting to convince Music Sales to purchase the Compositions on behalf of Mr. King, he was also trying to sell Music Sales "The Twist" on behalf of singer/songwriter Hank Ballard's estate, without any disclosure to Mr. King or his representatives of AREC's conflict of interest. Tr. 74:17-75:7.

72.     AREC goes to great lengths to self-servingly characterize its numerous discovery failures as unintentional and yet failed to produce critical contradictory documents, such as the April 28, 2015 contingent fee-sharing agreement.   DX EE.   AREC's failure to produce prejudicial documents undermines any attempt to characterize its failures as unintentional.  *See* DX W; C. Rubin Dep. at 181:3-20; Plaintiff's Requested Findings of Fact and Conclusions of Law ¶ 108.

73.     I find that the purported testimony of Mr. Rubin concerning the existence of an alleged oral agreement with Mr. King is not credible for the following reasons.

74.     First, despite AREC's contention that an oral agreement was made on December 1, 2014, there is absolutely no documentary evidence corroborating this claim.  None of the contemporaneous communications and documents make any mention whatsoever of an alleged oral agreement, including communications from AREC to Mr. King himself and Mr. Charap, AREC's counsel responsible for drafting all the agreements entered into by AREC and Mr. King.  *See* DX G, H.

75.     Second, Mr. Rubin's deposition testimony was fraught with contradictions and falsehoods.  Mr. Rubin lied about and denied the existence of the Irwin side agreements to compensate Mr. King's manager, until he was confronted with his own e-mail communications regarding these side deals.  Even then, Mr. Rubin admitted that he never disclosed the Irwin side agreements to Mr. King.  The Irwin side agreements were plainly designed to create a conflict of interest for Mr. Irwin to facilitate AREC's sale of Mr. King's rights.  *See* PX 25; DX C, T, CC.

76.     Third, although Mr. Rubin plainly knew that the Termination Agreement was invalid and unenforceable under the Copyright Act, there is no evidence in the record that this fact was ever disclosed to Mr. King and, indeed, it appears that these issues were affirmatively

18

concealed from him.  *See* C. Rubin Dep. at 40:23-42:5.  This omission was material, because it prevented Mr. King from consummating the contemplated transaction for several years.

77.     Fourth, Mr. Rubin actively encouraged and approved Mr. Charap's efforts to circumvent and undermine Mr. King's counsel, Mr. Lane, by Mr. Charap's attempting to communicate directly with Mr. King, a represented party, impugning Mr. Lane's integrity in an effort to secure Mr. King's cooperation with a potential sale, and urging Mr. Lane to accept a "Finder's Fee" and stop interfering with AREC's attempts to convince Mr. King to approve a sale.  *See* DX T.

## Proposed Conclusions of Law

1.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367.

## AREC Has Failed to Prove that King Entered into the Alleged Oral Agreement

2.     AREC's claim that Mr. Rubin entered into an oral contract with Mr. King, pursuant to which Mr. King purportedly authorized AREC to sell his writers' royalties, fails for the simple reason that AREC has not proven by a preponderance of the evidence the existence of any such agreement.  Under New York law, the essential elements of an action for breach of contract are: (1) the existence of a contract between the parties; (2) performance by plaintiff; (3) non-performance by defendant; and (4) resulting damages to plaintiff.  *Maricultura Del Norte, S. DE R.L. DE C.V. v. Worldbusiness Capital, Inc.*, 159 F. Supp. 3d 368, 376 (S.D.N.Y. 2015); *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379 (S.D.N.Y. 2014).

3.     It is undisputed that, on July 31, 2014, AREC entered into the Termination Agreement, pursuant to which AREC would, *inter alia*, negotiate the sale of Mr. King's share of the copyrights in the Compositions, to the extent that Mr. King was able to recover such

copyrights under the Copyright Act's termination provisions.   The Termination Agreement specifically provided, however, that AREC was *not* authorized to sell, or share in, Mr. King's writers' royalties derived from the Compositions.  PX 1; DX B.

4.      In both its Complaint and First Amended Complaint, AREC alleged that it had entered into the Termination Agreement, pursuant to which it would negotiate the sale of Mr. King's copyrights in the Compositions, but acknowledged that AREC was not authorized to sell, or share in, Mr. King's writers' share.  It was only after this Court dismissed AREC's claims pursuant to the Termination Agreement, and found that the Termination Agreement was invalid under the Copyright Act, that AREC alleged, for the first time, the purported existence of an oral agreement with Mr. King.  Dkt. 1, 17, 28, 43, 44, 45.

5.      AREC provides no documentary evidence supporting the existence of any such oral agreement; to the contrary, the documentary evidence definitively refutes the existence of any oral agreement.  For example, following the December 1, 2014 meeting between Mr. Rubin and Mr. King, AREC sent Mr. King two new written contracts to memorialize agreements reached during the meeting (the Audit and SoundExchange Agreements). Yet Mr. Rubin inexplicably did not take this opportunity to send Mr. King any written contract reflecting any supposed oral agreement to authorize the sale of his writers' share.  Had Mr. King and AREC actually entered into a new agreement that materially modified the terms of the written Termination Agreement, obviously that modification would have been reflected in the written agreements that AREC prepared in the immediate aftermath of the December 1, 2014 meeting. *See* PX 2, 3; DX G, H, J.

6.      Nor is the supposed oral agreement referenced in any of AREC's written communications with Mr. King following the December 1, 2014 meeting, or in any of its emails

to Mr. King's family members following his death.  After Mr. King passed away on April 30, 2015, AREC's representatives sent a number of emails to his family members discussing and attaching the written agreements that AREC had entered into with Mr. King.  But nowhere in any of these email communications did AREC ever suggest that it entered into an additional oral agreement with Mr. King, or that Mr. King had authorized AREC to sell his writers' royalties for any particular amount.  *See* DX AAA, FFF.

7.      The only evidence supporting the existence of the purported oral agreement is the word of Mr. Rubin, who was deposed during discovery in this case but passed away before trial. Twenty-seven days after Mr. Rubin's deposition, AREC's counsel submitted an errata sheet, prepared by AREC's counsel and notarized by Mr. Rubin's daughter, an AREC employee and officer, which added testimony that "He [Mr. King] also agreed to the 10% fee on the sale of the writers' royalties."  DX UUU.  No explanation was provided for this change on the errata sheet in violation of Federal Rule of Civil Procedure 30(e), which requires the deponent to sign a statement listing not only the changes, but also the reasons for making them.  Fed. R. Civ. P. 30(e)(1)(B); *see HR US LLC v. Mizco Int'l, Inc.*, 2010 WL 3924548, at *9-10 (E.D.N.Y. Sep. 28, 2010) (noting that, although not raised by the parties, an errata sheet could ultimately have been stricken for failing to comply with the procedural requirement that reasons for the changes be included).  As explained above, Mr. Rubin's testimony is not credible.  *See* Findings No. 66-70 *supra*.

8.      Accordingly, AREC has failed to prove that an oral agreement was made and its breach of contract claim necessarily fails.  *See Kavitz v. IBM*, 458 F. App'x 18, 19 (2d Cir. 2012) ("To establish the existence of an enforceable agreement under New York law . . . there must be an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound."); *IBM*

*Corp. v. Johnson*, 629 F. Supp. 2d 321, 330 (S.D.N.Y. 2009) ("Under New York law, 'an acceptance must comply with the terms of the offer and be clear, *unambiguous and unequivocal*.'") (emphasis in original) (quoting *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998)).

**Even Accepting Rubin's Testimony, the Alleged Oral Agreement Was Insufficiently Definite in its Essential Terms**

9.      In any event, the evidence put forth by AREC, even if believed, is insufficiently definite to constitute an enforceable contract.

10.      "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. New York State DOT*, 93 N.Y.2d 584, 589-90 (1999) ("[D]efiniteness as to material matters is of the very essence of contract law. Impenetrable vagueness and uncertainty will not do.").   The party alleging the existence of a contract bears the burden of establishing, with sufficient definiteness, all of the essential terms of the alleged contract.   *See NFL Ins. by Lines v. B&B Holdings*, 874 F. Supp. 606, 611 (S.D.N.Y. 1995).

11.      In addition to permitting a court to determine what the agreement is, "the requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989).

12.      "[W]here an alleged contract is oral, plaintiff has a particularly heavy burden to establish objective signs of the parties' intent to be bound . . . because 'a primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they

never intended.'"  *Oscar Prods. v. Zacharius*, 893 F. Supp. 250, 255 (S.D.N.Y. 1995) (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989)).

13.     Here, Mr. Rubin testified during his deposition that the purported oral agreement was created during the December 1, 2014 meeting with Mr. King, when, in response to Mr. Rubin's stating that he believed he could sell Mr. King's combined copyrights and writers' share for a total of at least $8 million, Mr. King responded, "Go for it."  AREC claims that, by those words, Mr. King entered into a binding contract, authorizing Mr. Rubin to sell Mr. King's writers' share for $6.5 million, and granting AREC ten percent of the sale proceeds, regardless of whether Mr. King ever even sold his rights.  Even crediting Mr. Rubin's testimony, however, three words – "go for it" – do not establish that Mr. King intended to be bound by an agreement that would require him to sell his copyrights and writers' share (much less his writers' share standing alone) if AREC were to obtain a combined offer of $8 million.  At most, these words would suggest that Mr. King was interested in learning about potential values, not binding himself to accept an offer at any particular price, much less the outcome urged by AREC that Mr. King's heirs would pay a commission on a deal that was never even accepted or consummated.  *See Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 338, 350 (S.D.N.Y. 2013) (finding the exclamation "Dope!" in response to request for approval to be "entirely too enigmatic and elliptical to constitute the unambiguous and unequivocal acceptance necessary for contract formation).

14.     AREC's argument that this mere expression of interest somehow created a binding contract *obligating* Mr. King to sell his writers' share, standing alone, for $6.5 million also fails because AREC cannot establish the existence of an oral agreement that is sufficiently definite in its essential terms.  *See NFL Ins.*, 874 F. Supp. at 611.  Critically, Mr. Rubin

acknowledged that there was no discussion during the December 1, 2014 meeting (or ever) of selling Mr. King's writers' share alone, separate from the underlying copyrights in the Compositions.  C. Rubin Dep. at 48:23-49:7.  Yet this is precisely the result AREC now urges.

15.     Moreover, Mr. Rubin never even discussed with Mr. King what, exactly, Mr. King's "writers' share" comprised – thus, there was no sufficient definiteness as to the very subject matter of the purported oral agreement.  C. Rubin Dep at 62:15-64:19.  This might be less of a concern if the writers' share were to be sold together with Mr. King's underlying copyrights, because a combined sale can be understood as an author selling his entire interest in copyrighted works.  However, if a "writers' share" is to be sold independently from underlying copyrights, there must be some definition of what the writers' share comprises.  Mr. Rubin's testimony does not suggest that Mr. King shared AREC's understanding of what his writers' share comprised, or that these complex interpretational questions were ever even discussed.  *See NFL Ins.*, 874 F. Supp. at 611.

16.     Additionally, there is no credible or admissible evidence that Mr. Rubin ever discussed with Mr. King the fee that AREC would receive upon a sale of Mr. King's writers' royalties standing alone, and it is well-settled that "[p]rice or compensation are material terms in a contract requiring definiteness," *Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005), and courts regularly find even written brokerage agreements, much less the oral agreement at issue here, indefinite and unenforceable for failing to adequately set a rate of compensation.  *See, e.g., Cooper Square Realty, Inc. v. A.R.S. Management, Ltd.*, 181 A.D.2d 551, 551 (1st Dep't 1992).

**There Was No Agreement Between King and Music Sales as to All Material Terms**

17.     Even if the Court were to credit Mr. Rubin's testimony and, further, find that Mr. King's "go for it" created an enforceable contract, this is still not enough for AREC to prevail, as "the broker must ordinarily . . . bring the parties to an agreement" in order to earn a fee. *Northeast Gen. Corp. v. Wellington Advert.*, 82 N.Y.2d 158, 163 (1993). This requires that the broker "demonstrate that he or she produced a ready, willing and able purchaser *who came to a meeting of the minds with the seller as to all of the material terms of the sale*." *Pinnacle Realty of N.Y., LLC v. 255 Butler, LLC*, 125 A.D.3d 952, 953 (2d Dep't 2015) (emphasis added) (quotations and citations omitted); *see also, e.g.*, 11 N.Y. Jur. 2d *Brokers* § 124 (broker's right to a commission requires that "the seller and buyer have come to a meeting of the minds on the essential terms of the transaction"). AREC cannot make such a showing, because there is no evidence that Mr. King even received, much less accepted, any offer procured by AREC.

18.     Unless and until a meeting of the minds between the prospective purchaser and seller occurs, the broker's client "has the absolute right before a bargain is made [and] before commissions are earned, to revoke the broker's authority[.]" *Sibbald v. Bethlehem Iron Co.*, 83 N.Y. 378, 384 (1881); *see also, e.g.*, *Ryan, Beck & Co. v. Fakih*, 268 F. Supp. 2d 210, 225 (E.D.N.Y. 2003) (broker agreement with no specific provision for duration is terminable at will); *Aegis Prop. Servs. Corp. v. Hotel Empire Corp.*, 106 A.D.2d 66, 72 (1st Dep't 1985) ("[T]he right of the principal to terminate [the broker's] authority is absolute and unrestricted . . . ."). It is equally well-settled that a brokerage agreement, like any other agency relationship, terminates by operation of law upon the death or incapacity of the principal. *See, e.g.*, 2A N.Y. Jur. 2d *Agency and Independent Contractors*, § 46 ("Generally, the death of the principal operates as an instantaneous and absolute revocation of the agent's authority or power . . . ."); *In re Szabo's*

*Estate*, 10 N.Y.2d 94, 99 (1961) (principal's death "automatically revoked the agency"); *Campbell v. United States*, 1981 U.S. Dist. LEXIS 10994, at *3 (E.D.N.Y. Jan. 9, 1981) ("Where 'the decedent was mentally incompetent or incapacitated by reason of [his] alleged comatose or semicomatose state, then the agency would have been suspended or revoked.'") (quoting *In re Berry's Estate*, 69 Misc. 397, 400 (Sur. Ct. Queens Cty. 1972)).

19.     Thus, in order to prevail on its claim, AREC must establish not only that it entered into an enforceable brokerage agreement with Mr. King, but also that it introduced Mr. King to a prospective purchaser and brought them to a meeting of the minds, as to all material terms, before Mr. King passed away or became incapacitated.  *See* 11 N.Y. Jur. 2d *Brokers* § 154 ("To be entitled to a brokerage commission, there must be a showing that the broker brought the parties together at mutually acceptable terms *within the period of the broker's employment*.") (emphasis added).  AREC has failed to satisfy this burden.

20.     Mr. King was hospitalized for the entire month of April, 2015.  In the early morning on April 20, he developed acute pulmonary edema, was unable to breath, and required tracheal intubation, *i.e.*, a plastic tube was inserted down into his windpipe to prevent asphyxiation.   Mr. King remained intubated and semi-comatose, unable to communicate verbally, from this point until he passed away on April 30, 2015.  DX V; Berkowitz Aff. ¶¶ 2-4.

21.     Although AREC argues that it is entitled to a commission because it obtained an offer from Music Sales on terms that were purportedly acceptable to Mr. King, AREC never even conveyed Music Sales' alleged "offer" to Mr. King, much less did it bring the parties to a meeting of the minds.  *See* 11 N.Y. Jur. 2d *Brokers* § 127 ("A broker is not entitled to a commission for procuring a party ready, able and willing to accept the terms specified by the principal unless the broker has notified the owner that he or she has procured such a party."); *see*

*also Ostroff v. Doctor*, 238 N.Y. 264, 265 (1924) (procurement of a buyer, sufficient to entitle a broker to commissions, "will commonly include the disclosure of the buyer's name, for without this the seller cannot investigate financial responsibility, nor even close the contract").

22.     The evidence in the record establishes that Music Sales emailed a qualified written offer letter to Mr. Rubin (which offer was conditioned on there being a written contract and full due diligence) on Friday, April 17, 2015.  DX S.  Mr. Rubin did not see the Music Sales conditional written offer until Monday, April 20 and AREC did not attempt to communicate the Music Sales conditional offer letter to Mr. King until 8:37 pm on April 20, when Mr. Charap emailed a copy to Mr. King's daughter, Ms. Terris Cannon.  PX 25; DX T; C. Rubin Dep. at 357:21-359:6.  By that time, Mr. King was already incapacitated as a result of his intubation, and any oral brokerage agreement had already terminated, as a matter of law.  Mr. King could not, therefore, have breached the purported oral brokerage agreement by failing to accept a Music Sales conditional offer that he never even received prior to his death.

23.     Even setting aside the fact that Music Sales' purported offer was never effectively communicated to Mr. King prior to his death, AREC's claim also fails because AREC has not established that Mr. King and Music Sales ever came to the necessary "meeting of the minds" as to all of the material terms of a sale of Mr. King's writers' royalties from the Compositions. AREC's entire theory of the case is predicated on Mr. Rubin's testimony that Mr. King said, "Go for it," after Mr. Rubin stated that he could sell Mr. King's combined copyrights and writers' royalties for at least $8 million.  Even if those three words constitute a promise by Mr. King to sell his interest in the Compositions for that amount – and they do not – the law is clear that "mere agreement as to price . . . does not constitute a meeting of the minds" sufficient to entitle a broker to commissions.  *Kaelin v. Warner*, 27 N.Y.2d 352, 354 (1971).  Rather, "[t]he parties

must be brought to agreement with respect to all terms customarily encountered in such a transaction," and "[w]here an owner merely specifies the purchase price of property, without fixing the other terms of sale, commissions are not earned . . . ."  *Id.* at 355; *see also, e.g.*, *Devine Real Estate, Inc. v. Brennan*, 42 A.D.3d 646, 647 (3d Dep't 2007) (broker not entitled to commission where, "although [buyer] made an offer to purchase the property at defendants' selling price, there was no meeting of the minds on the material terms of the sale . . . ."); *Posson v. Hayes*, 37 A.D.3d 936, 937 (3d Dep't 2007) ("[I]t is incumbent upon the broker to bring the parties in agreement not only with respect to the price but 'to all terms customarily encountered in such a transaction' before the commission is earned.") (citing *Kaelin*, 27 N.Y.2d at 355).

24.     Here, even if Mr. King had committed to selling his interest in the Compositions for any particular price – and the Court finds he did not – he certainly did not come to a meeting of the minds with Music Sales as to all of the material terms of a sale.  First, Music Sales never even made a binding offer to acquire Mr. King's interest in the Compositions; rather the conditional written offer letter made clear that any offer was contingent on there being "a written contract and full financial and copyright due diligence."  It is indisputable that Mr. King never entered into a written contract with Music Sales, and that "full financial and copyright due diligence" never occurred.  Since these express conditions were never satisfied, there could not have been a meeting of the minds entitling AREC to receive a broker's fee.  *See, e.g.*, *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 203 (S.D.N.Y. 2008) (where "either party communicates an intent not to be bound until an agreement is fully executed, 'no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract'") (quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985)); *2001 Real Estate: Space Catalyst v. DiBenedetto*, 207 A.D.2d 442, 442 (2d Dep't 1994) (plaintiff not entitled to broker's fee where

"[t]he record indicates that while the parties to the proposed transaction had, in fact, signed a letter concerning some material terms to the lease, they did not consider these terms to be complete, final or binding," and thus the parties "never reached an agreement . . . concerning the essential terms of the transaction").

25.     Furthermore, AREC's argument that full due diligence would not have produced adverse information is incompetent speculation.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

26.     Second, even accepting Mr. Rubin's testimony as true, Mr. King never agreed to sell (and Music Sales never agreed to purchase) his "writers' share" standing alone, without *also* selling (or acquiring) the underlying copyrights.  Mr. Rubin testified that he and Mr. King only discussed a combined sale of his copyrights *and* writers' royalties; and the Music Sales letter conditionally offered to acquire both the copyrights and writers' share.  However, this Court has already determined that any sale of Mr. King's copyrights would have been invalid under the plain language of the Copyright Act.  Since Mr. King never even discussed selling his writers' share standing alone, he certainly never came to a meeting of the minds with Music Sales to do so.

27.     Third, while an agreement as to price is insufficient to entitle a broker to a commission, far from bringing Mr. King and Music Sales to a meeting of the minds on the price term, Mr. Rubin was actively seeking to negotiate a higher price from Music Sales up to (and after) the time of Mr. King's death.  Both Mr. Rubin and Mr. Charap repeatedly acknowledged that the offer set forth in the Music Sales letter was not enough to accept, that they were trying to get more, and that they hoped to boost the offer price after receiving the results of the Sony/ATV

royalty examination – which was not even scheduled to commence until July 2015 (months after Mr. King's death).  Indeed, in their emails to Mr. King's family after his death, AREC and its representatives never claimed that King had accepted Music Sales' offer; to the contrary, they claimed only that AREC had received an offer from Music Sales, that it was "working on a counteroffer" when Mr. King passed away, and that it was continuing to solicit additional offers after Mr. King's death.  DX AAA, FFF; *see Berman*, 580 F. Supp. 2d at 203; *Devine Real Estate*, 42 A.D.3d at 647.

28.     In conclusion, the incomplete, preliminary, and conditional written offer from Music Sales, which was never even received (much less accepted) by Mr. King prior to his death, and which AREC itself found unacceptable and treated only as a starting point for further negotiations, does not give rise to a meeting of the minds between Mr. King and Music Sales as to all the material terms of a sale of Mr. King's writers' royalties derived from the Compositions.  AREC's claim that it is somehow nevertheless entitled to a $780,000 "broker's fee," on a transaction that never took place, must be rejected.  *See DiBenedetto*, 207 A.D.2d, at 442.

**AREC's Alleged Oral Agreement is Barred by the Statute of Frauds**

29.     Section 5-701(a)(10) of New York's General Obligation Law provides that any agreement "to pay compensation for services rendered in negotiating . . . the purchase [or] sale . . . of a business opportunity . . . or an interest therein" must be in writing.  This provision has been held to bar oral contracts where an agreement was made for one party to "provide alleged 'know-who' and 'know-how' in bringing together" the parties to a transaction.  *Intertex Trading Corp. v. Ixtaccihuatl S.A. de CV*, 754 F. Supp. 2d 610, 616 (S.D.N.Y. 2010).

30.     Here, this provision plainly bars AREC's claims based on the purported oral agreement, by which AREC purported to provide "know-who" and "know-how" to broker the

sale of famous creative works and the revenues derived from exploiting those works.  *See, e.g.*, *Sporn v. Suffolk Mktg., Inc.*, 56 N.Y.2d 864, 865 (1982) (alleged oral agreement to procure rights to market musical recordings involved a "business opportunity," and was thus barred by Statute of Frauds); *Stephen Pevner, Inc. v. Ensler*, 309 A.D.2d 722, 722 (1st Dep't 2003) (plaintiff who assisted defendant in exploiting her literary work was "negotiating the purchase or sale of a business opportunity," and plaintiff's claim for breach of an oral contract "was properly dismissed as barred by the statute of frauds").

31.     AREC has argued that an agreement to broker the sale of Mr. King's writers' royalties does not involve a "business opportunity . . . or an interest therein," because the writers' share is merely a passive "royalty stream."  The record evidence belies this argument, however. Mr. Rubin acknowledged that he and Mr. King only ever discussed a combined sale of Mr. King's underlying copyrights and his writers' royalties together, and not the sale of a "royalty stream" standing alone.  Furthermore, Mr. Rubin testified that, in his mind, the term "writers' share" did not simply involve the royalties Mr. King received under his existing agreements, but also encompassed a right to share in the proceeds from post-termination exploitations of Mr. King's copyrights.  C. Rubin Dep. at 29:18-30:20, 491:22-492:7, 494:2-495:21; *see, e.g.*, *Intertex Trading Corp.*, 754 F. Supp. at 615-16.

32.     In any case, however the term "writers' share" is defined, the value of and proceeds from the writers' share are dependent on the ongoing licensing and exploitation of King's creative works – this plainly constitutes a "business opportunity" or an "interest therein" under any reasonable reading of the words.  Indeed, following the New York Court of Appeals' seminal decision in *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 265 (1977), courts have interpreted the phrase "business opportunity . . . or an interest therein" quite broadly, and

have found that the Statute of Frauds applies to broker's fees for transactions such as: a party acting as an agent for the sale of textile goods in exchange for a 3% commission, *see Intertex Trading Corp.*, 754 F. Supp. at 615-16; an agreement to lease a single aircraft for three months, for $3.2 million, *see Tower Int'l, Inc. v. Caledonian Airways, Ltd.*, No. 97-7378, 133 F.3d 908 [Table], 1998 WL 3614, at *2 (2d Cir. Jan. 8, 1998); the leasing of billboard space, *see Alliance Media Grp., Inc. v. Mogul Media, Inc.*, 2005 WL 1804473, at *1 (E.D.N.Y. Jul. 28, 2005); the purchase of a single aircraft, *see Greystone P'ships Grp., Inc. v. Koninklijke Luchtvaart Maatschappij N.V.*, 815 F. Supp. 745, 755-57 (S.D.N.Y. 1993); the sale of a camera surveillance system, *see Merex A.G. v. Fairchild Weston Sys.*, 810 F. Supp. 1356, 1366 (S.D.N.Y. 1993); the sale of powdered milk, *see Royal Consulting, Inc. v. Agri-Mark*, 1990 WL 83445, at *1 (S.D.N.Y. June 13, 1990); and the sale of chemical fertilizer, *see Int'l Trading and Sales, Inc. v. Phillip Bros., Inc.*, 97 A.D.2d 699, 699 (1st Dep't 1983).

33.     If the sale of these fixed assets involves a "business opportunity" within the meaning of the statute, the term certainly applies to a purported agreement to sell an interest in the exploitation of Mr. King's copyrights, the value of which is not fixed, but rather depends on the success of future licensing efforts.  As the Second Circuit held in *Tower Int'l*:

> We read the New York Court of Appeals' decision in *Freedman* to suggest that when an alleged commission agreement arises in a situation where the risk of "false or exaggerated claims" . . . [is] high, or that the role is of sufficient importance that one would expect it to be formalized, there is a strong case for finding that agreement to be within the Statute of Frauds.  *An agreement to pay a 5% commission on a $3.2 million transaction does not strike us as the facts upon which oral contracts are likely to be made.*

1998 WL 3614, at *2 (emphasis added) (quotation and citation omitted).  The same holds true with AREC's claim for a 10% commission on an alleged $7.8 million transaction – which never even closed, and was directly inconsistent with the terms of a prior, written agreement.

34.     As the New York Court of Appeals has held, the purpose of § 5-701(a)(10) is to guard against "false or exaggerated claims [that] can be asserted easily and disproved only with difficulty.  *Freedman*, 43 N.Y.2d at 267; *see also Sugarman v. MCY Music World, Inc.*, 158 F. Supp. 2d 316, 322-23 (S.D.N.Y. 2001) (purpose of § 5-701(a)(10) is to protect against oral brokerage contract cases "'which all too often degenerate[] into swearing contests' . . . with the attendant risk of perjury") (quoting *Merex*, 810 F. Supp. at 1366)).  Here, only after the Court dismissed AREC's claims based on the written Termination Agreement did AREC allege, for the first time, the existence of an oral brokerage agreement with a man no longer alive to refute AREC's claims.  The existence of the purported oral agreement is entirely inconsistent with the written documents, AREC never mentioned the existence of such an agreement in any communications with Mr. King's family members or their representatives, and AREC offers no explanation for why it did not memorialize its purportedly revised agreement with Mr. King in writing – even though it required Mr. King to sign two additional written agreements following the December 1, 2014 meeting at which the oral agreement was supposedly formed.  *See Freedman*, 43 N.Y.2d at 267 (Statute of Frauds applied "in the absence of a writing, so easily obtained in a proper case").  And AREC's principal demonstrated an unfettered willingness to lie when the facts were at odds with his claims.  Particularly in these circumstances, "the statute is entitled to be read both in accordance with its plain meaning, its evident purpose, and to accomplish the prevention of the mischief for which it was designed." *Id.*

**The Pre-Termination Sale of Future Royalties Is Invalid under the Copyright Act**

35.     The Court previously dismissed AREC's claims based on the written Termination Agreement because it purported to transfer Mr. King's future copyright interests in the Compositions, prior to the effective dates of termination upon which the copyrights would revert

to him.  As the Court recognized, such a transfer was invalid under the plain language of the Copyright Act, 17 U.S.C. § 304(c)(6)(D), which provides that "[a] further grant, or agreement to make a further grant, of *any right covered by a terminated grant* is valid only if it is made after the effective date of termination." (emphasis added).

36.     AREC's claim concerning the alleged oral agreement to sell Mr. King's writers' royalties derived from the Compositions fails for the same reason – since AREC claims that such a sale would have entitled Music Sales to receive hypothetical future "royalties" under post-termination transfers of copyright that did not (and could not) exist prior to the Compositions' effective dates of termination, the purported sale is prohibited by Section 304(c)(6)(D).

37.     In granting AREC leave to amend its complaint, the Court stated that "any assignment of royalty payments alone does not necessarily, in all circumstances, imply a transfer of copyright ownership or a direct interest in the copyright," and that "more argument or fact development can clarify the picture."  Dkt. 65 at 6.  Such additional clarity was provided during Mr. Rubin's deposition.  Rubin acknowledged that, if Mr. King were to sell his copyrights to someone other than Music Sales after the effective dates of termination, the new copyright owner would have been obligated to pay royalties to Music Sales, as a result of Mr. King's purported transfer of his "writers' share."  C. Rubin Dep. at 491:22-492:7.  Indeed, Mr. Rubin testified that even if Mr. King never transferred his copyrights after the effective dates of termination, but rather continued to own them himself, he would have had to pay writers' royalties, on his own copyrights, to Music Sales.  *Id.* at 494:2-495:21.

38.     In other words, according to Mr. Rubin's own testimony, the "writers' share" that he sought to transfer was not merely an existing contractual royalty stream; rather, according to Mr. Rubin, Music Sales would have been entitled to share in the value of Mr. King's copyrights

with their future owner, whomever that may be. *Id.* at 491:22-492:7. Because Mr. King could have altered or even eliminated the writers' share when re-selling the copyrights post-termination, any pre-termination sale of the writers' royalties would have required a prudent and experienced buyer such as Music Sales to restrict and require a songwriter such as Mr. King to represent and warrant that any future sale of his copyright interest would not reduce or eliminate the then-existing writers' share otherwise payable to Mr. King. Absent such a requirement, Music Sales would have paid a substantial price for a writers' royalty rendered worthless once Mr. King sold his copyright interest after the effective dates of termination in 2016 and 2017. Absent such a warranty and representation, the only effective protection for Music Sales was to require Mr. King to sell his copyright interest to Music Sales, which interest was not yet his to sell. In other words, the purported oral agreement fails either because the Music Sales offer was indefinite as to a material term or it violated Section 304 of the Copyright Act. *See* 17 U.S.C. § 304(c)(6)(D); *Artists Rights Enf't Corp.*, 224 F. Supp. 3d at 236. Thus, Mr. Rubin plainly sought to transfer to Music Sales an interest in the copyrights themselves, prior to the effective dates of termination – in violation of Section 304(c)(6)(D). AREC cannot receive a brokerage commission in connection with a transaction that never even closed, and would have been invalid if it had. *See North Am. Distributing Co. v. Distillers Factors Corp.*, 190 Misc. 221, 222 (Civ. Ct. N.Y. Cty. 1947) ("As the underlying agreement of sale was illegal when made, no valid contract ever came into being, nor could any right to brokerage commissions be predicated thereon.").

**The Plain Language of the Audit Agreement Made AREC Responsible for its Own Costs**

39. In its remaining claim, AREC alleges that Defendants breached the Audit Agreement, dated December 15, 2014, pursuant to which Mr. King retained AREC to "provide

professional services" in connection with undertaking a royalty examination of Sony/ATV. AREC alleges that it has been damaged in the amount of $32,745, consisting of amounts it has either paid to, or become indebted to, Prager Metis in connection with the royalty examination. Dkt. 44.  This claim also fails.

40.     The Audit Agreement provided that AREC would perform its professional services in connection with the royalty examination "on a purely contingent basis" – in the event that the royalty examination resulted in some recovery from Sony/ATV, AREC would be entitled to receive thirty-three and one-third percent (33 1/3%) of the net amount recovered, after AREC recovered its recoupable costs.  The Audit Agreement further provided that AREC would "advance, at [its]sole risk, all of the costs of the audit[,]" that such costs were "recoupable only[,]" and that Mr. King was "not responsible for any such costs that [AREC] fail[ed] to recover from the results of the audit."  The Audit Agreement thus expressly provided that AREC was not entitled to recover its costs, unless the royalty examination resulted in some recovery from Sony/ATV.  PX 2; DX J.

41.     Despite this clear provision, AREC seeks to recover "expenses" that it purportedly incurred in connection with the royalty examination.  But AREC did not allege, much less prove at trial, that the royalty examination resulted in any recovery from Sony/ATV; to the contrary, the analysis prepared by Prager Metis indicated that no such recovery was forthcoming.  AREC thus has failed to meet its burden of proving either a breach of contract by Mr. King's estate (much less any of the other Defendants, who are not parties to any agreement with AREC), or damages resulting therefrom.  *See, e.g.*, *Swan Media Grp., Inc. v. Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012) (breach and damages are elements of breach of contract claim).

**The Audit Agreement Was Validly Terminated**

42.     AREC's claims concerning the Audit Agreement fail for the additional reason that the Audit Agreement terminated, as a matter of law, upon Mr. King's death.   The Audit Agreement provides, on its face, that Mr. King was retaining AREC "to provide professional services to me in connection with the undertaking of an audit . . . ."  PX 2; DX J.  It is well-settled that such personal services agreements and agency relationships terminate as a matter of law upon the death of the principal.  *See, e.g.*, *Lacy v. Getman*, 119 N.Y. 109, 115-16 (1890) (personal services contract terminated automatically upon death of master); *Minevitch v. Puleo*, 9 A.D.2d 285, 287-88 (1st Dep't 1959) (personal service contracts are terminated "by the death of the master or that of the servant"); 2A N.Y. Jur. 2d *Agency and Independent Contractors* § 46 ("Generally, the death of the principal operates as an instantaneous and absolute revocation of the agent's authority or power . . . .").

43.     Accordingly, the Audit Agreement – pursuant to which AREC agreed to perform services as Mr. King's agent – terminated as a matter of law upon Mr. King's death on April 30, 2015.  *See Lacy*, 119 N.Y. at 115-16.   By that date, the royalty examination had not even commenced – Prager Metis did not even begin its fieldwork at Sony/ATV's offices until July 2015, months after Mr. King's passing.  AREC had no right to conduct an audit, ostensibly on the estate's behalf, without the estate's permission after the Audit Agreement terminated.  For this additional reason, even if AREC was otherwise entitled to recover its expenses, it is not entitled to recover any expenses incurred after Mr. King's death on April 30, 2015.  *See Estate of Szabo*, 10 N.Y.2d at 99; 2A N.Y. Jur. 2d *Agency and Independent Contractors* § 46 ("[A]ny act done by the agent as such after the principal's death will not affect the estate of the latter.").

44.     Moreover, even if the Audit Agreement somehow did not terminate as a matter of law upon Mr. King's death, and passed to his estate, on November 2, 2015 the estate's attorney, Lisa Alter, expressly directed AREC to cease any activity in connection with the royalty examination on behalf of the estate.  The law is clear that "where a personal services contract does not specify 'a term certain for its duration,' the law permits the parties to treat the contract as 'terminable at will.'"  *Healthware Inc. v. New York Soc'y for the Relief of the Ruptured and Crippled Maintaining the Hosp. for Special Surgery*, 2011 WL 110765587, at *12 (Sup. Ct. N.Y. Cty. July 1, 2011) (quoting *Interweb, Inc. v. iPayment, Inc.* 12 A.D.3d 164, 165 (1st Dep't 2004)), *aff'd*, 99 A.D.3d 494 (1st Dep't 2012); *see also Sabetay v. Sterling Drug*, 69 N.Y.2d 329, 333 (1987) ("It is still settled law in New York that, absent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party."); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1062 (2d Cir. 1993) ("Under New York law, a contract for services that makes no specific provision for duration is presumed to be terminable at will.").  Despite the clear direction from the estate's counsel, AREC continued to direct Prager Metis to perform work in connection with the audit after the agreement was indisputably terminated.  AREC certainly may not recover any expenses incurred after this date.

**AREC Never Even Alleged the Existence of Any Contracts with the Individual Defendants**

45.     Each of AREC's claims are based on agreements that it purportedly entered into with Mr. King prior to his death.  Even assuming that these agreements existed, survived Mr. King's death, and passed on to his estate, AREC indisputably never entered into any agreements with any of Mr. King's widow, son, or daughters, each of whom are named as defendants in this action and accused of breaching the agreements at issue.  AREC's breach of contract claims

against the individual members of Mr. King's family are indicative of the bad faith and frivolousness that underlie all of AREC's claims.  *See Porky Prods. v. Nippon Express U.S.A. (Ill.)*, 1 F. Supp. 2d 227, 234 (S.D.N.Y. 1997) (characterizing as frivolous and "mystifying" defendants' contention that a contract imposed an obligation on a consignee that was not a party to the agreement), *aff'd*, 152 F.3d 920 (2d Cir. 1998).

### Under CPLR 4519, Mr. Rubin Is Precluded from Testifying About the Alleged Oral Agreement with Mr. King

46.     New York's CPLR 4519 provides, in pertinent part:

> Upon the trial of an action . . . a party or a person interested in the event, *or a person from, through or under whom such a party or interested person derives his interest* or title by assignment or otherwise, shall not be examined as a witness in his own behalf or interest, *or in behalf of the party succeeding to his title or interest* against the executor, administrator or survivor of a deceased person . . . concerning a personal transaction or communication between the witness and the deceased person . . . .

CPLR 4519 (emphasis added).

47.     The purpose of the statute is to protect deceased or mentally ill persons "from claims of the living who, through their own perjury, could make factual assertions which the decedent could not refute in court."  *Poslock v. Teachers' Ret. Bd.*, 88 N.Y.2d 146, 151 (1996) (quoting *In re Estate of Wood*, 52 N.Y.2d 139, 144 (1981)).  It is beyond dispute that federal courts sitting in diversity must apply CPLR 4519 where, as here, New York law governs the underlying dispute.  *See, e.g.*, *Rosenfeld v. Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996) ("New York law, including its statute barring the testimony of certain interested witnesses, must be given effect."); *Clark v. Meyer*, 188 F. Supp. 2d 416, 419 n.16 (S.D.N.Y. 2002) ("As [CPLR 4519] is a rule of substantive law rather than a purely evidentiary principle, it applies in this diversity case . . . .").

48.     Here, the purpose of the statute mandates that Mr. Rubin should be prohibited from testifying concerning the formation of the alleged oral agreement with the decedent, Mr. King.  *See Wall St. Assocs. v. Brodsky*, 295 A.D. 2d 262, 263 (1st Dep't 2002) ("Since the purpose of CPLR 4519 is adversarial balance, deposition testimony should be held inadmissible under the Dead Man's Statute where, as here, the deceased never had his own deposition taken on the relevant matter.").   That purpose has special applicability here, as Mr. Rubin already showed a willingness to testify to demonstrable falsehoods and to repeatedly change his story every time those falsehoods were exposed.   For example, on numerous occasions Mr. Rubin withheld relevant documents from production, only to then deny the existence of those documents under the (mistaken) belief that Defendants had not independently obtained them and therefore could not refute his lies.   Furthermore, as explained above, it was only after the Court dismissed AREC's claims relating to the written Termination Agreement that AREC first alleged the existence of a purported oral agreement with Mr. King.   And the Court granted AREC leave to amend its complaint based in part on the allegation that AREC had conveyed an offer from Music Sales to Mr. King in December 2014 – an allegation that Rubin later admitted was completely untrue.   *Artists Rights Enf't Corp. v. Estate of King*, 2017 WL 2062988, at *4 (S.D.N.Y. May 15, 2017); *see* C. Rubin Dep. at 127:16-25.  Such a willingness to take advantage of a witness's or document's presumed unavailability as an opportunity to make false factual assertions is at the heart of what CPLR 4519 is intended to prevent.   *See Poslock*, 88 N.Y.2d at 151.

49.     In addition to being consistent with the purposes of CPLR 4519, preclusion of Mr. Rubin's testimony is also required by each of the statute's elements.   First, any testimony concerning an alleged oral agreement between Mr. King and Mr. Rubin plainly "concern[s] a

personal transaction or communication between the witness and the deceased person . . . ." CPLR 4519.  As the New York Court of Appeals has held, the "transactions or communications" referenced in the statute "embrace every variety of affairs which can form the subject of negotiation, interviews, or actions between two persons, and include every method by which one person can derive impressions or information from the conduct, condition, or language of another. *Holcomb v. Holcomb*, 95 N.Y. 316, 325 (1884); *see also, e.g., Pro Bono Invs., Inc. v. Gerry*, 2005 WL 2429777, at *7 (S.D.N.Y. Sep. 30, 2005) ("The meeting where the contract document was allegedly created was also a 'personal transaction or communication' between Bishop and Green."); *Griswold v. Hart*, 205 N.Y. 384, 395 (1912) (statute "excludes the testimony of an interested witness to any knowledge which he has gained by the use of his senses from the personal presence of the deceased").  Mr. Rubin's testimony that Mr. King allegedly authorized him to sell Mr. King's writers' royalties for $6.5 million plainly falls within this definition.

50.     AREC has argued that Mr. Rubin was not "interested in the event," and thus his testimony was not barred under CPLR 4519, because, two days before his deposition in this case, he transferred sole ownership of AREC to his wife – a transaction transparently designed to circumvent the statute.  However, one need not be a party to the litigation to have his or her testimony barred.  CPLR 4519 applies, on its face, to not only a party, but also to (i) "a person interested in the event," or (ii) "a person from, through or under whom such . . . interested person derives his interest."  CPLR 4519.

51.     Mr. Rubin's personal interest was not divested by reason of his transfer of corporate stock to his wife.  *See Pro Bono Invs.*, 2005 WL 2429777, at *7 (corporate officer barred from testifying, even though only corporate entity was listed as payee on Note, where

record contained surreptitiously tape-recorded conversation in which officer "claimed to have an interest" in the company).  Even accepting AREC's allegations and Mr. Rubin's testimony as true, there is nothing in the record indicating that Mr. King had agreed to enter into an oral agreement with AREC, rather than Mr. Rubin individually.  The Second Amended Complaint conspicuously alleges that Mr. King supposedly authorized *Mr. Rubin* to sell the writers' royalties – there is nothing suggesting that Mr. King believed he was contracting with a corporate entity.

52.     Further, Defendants uncovered agreements indicating that, in the days before Mr. King's death, Mr. Rubin claimed to have a *personal* interest in any sale of Mr. King's copyrights or writers' share, in addition to any interest held by his corporation.  On April 28 and 30, 2015, Mr. Rubin entered into agreements with, *inter alia*, Mr. Lane and Mr. Irwin, Mr. King's purported representatives, which indicated that Mr. Rubin had not yet agreed to a fee arrangement with Mr. King with respect to any sale of his writers' royalties, referred to fee arrangements that he may subsequently "make with Ben personally," and were signed by Mr. Rubin not only on AREC's behalf, but also in his individual capacity.  Since Mr. Rubin himself acknowledged having a personal interest in any potential transaction, CPLR 4519 should have barred his testimony.  *See Pro Bono Invs.*, 2005 WL 2429777, at *7.

53.     Alternatively, even if the transfer to his wife served to divest Mr. Rubin's interest in the purported oral agreement, it merely served to vest that interest in his wife, thus making Mr. Rubin the "person from, through or under whom [an] interested person derives [her] interest. CPLR 4519.  "A shareholder in a corporation which is a party to the action is interested in the event since his equity may be affected."  9 Weinstein-Korn-Miller, NY Civ. Prac. CPLR ¶ 4519.14 (2d ed. 2017); *see also, e.g., Romanoff Equities, Inc. v. Lucas*, 2010 N.Y. Slip Op.

30104(u), at *7 (Sup. Ct. N.Y. Cty. Jan. 12, 2010) ("Romanoff, as an officer and manager of plaintiff, having testified that he was the sole shareholder of plaintiff, would be interested in the event in this action."); *Mark Patterson, Inc. v. Bowie*, 172 Misc. 2d 1000, 1002 (Sup. Ct. N.Y. Cty. 1997) (witness was "an interested person due to his stock ownership in plaintiff").

54.     Even accepting that this was a *bona fide* transfer of Mr. Rubin's interest in the company that he founded – and not a sham transfer as part of a transparent effort to circumvent CPLR 4519 – this still did not permit him to testify.   "If it is claimed that the witness has divested himself of interest, it does not follow that he is thereby rendered competent."  *O'Brien v. Weiler*, 140 N.Y. 281, 285 (1893); *see also In re Aievoli's Will*, 272 A.D. 544, 546 (2d Dep't 1947) ("If we assume . . . that the waiver was sufficient to divest the interest of the witness, it does not follow that he was thereby rendered competent to testify.").  This is because the statute, on its face, prohibits not only an interested person from testifying, but also "a person from, through or under whom such [an] interested person derives his interest . . .  by assignment or otherwise . . . ."  CPLR 4519.

55.     Even if Mr. Rubin divested his interest by transferring his shares in AREC to his wife, that would serve only to render his wife "interested in the event."  Since Mr. Rubin was the person who allegedly contracted with the decedent, and the person from whom his wife allegedly derived her interest in the contract, he should have been precluded from testifying for her benefit. *See, e.g., Duncan v. Clarke*, 308 N.Y. 282, 285 (1955) ("The grandmother was an incompetent witness inasmuch as the testimony is that she was the person with whom the decedent is claimed to have contracted and through whom the infant plaintiff derives her interest."); *Rosseau v. Rouss*, 180 N.Y. 116, 122-23 (1904) (mother barred from testifying regarding alleged oral agreement for benefit of her son, because even though mother was not party to action or

interested in the event, "she made the contract which is the sole foundation for the action[,]" and her son "derive[d] his title from her"); *In re Aievoli's Will*, 272 A.D. at 547 (witness precluded from testifying despite waiving rights under his will, because his waiver served to effect a proportionate enlargement of interest of each of other distributees, rendering them his successors in interest); *In re Estate of Bourne*, 206 Misc. 378, 380 (Sur. Ct. Suffolk Cty. 1954) (mother barred from testifying regarding conversation with decedent, despite renouncing any interest in the estate, because daughter stood to share in portion mother had renounced, and thus mother was "a possible successor to the first wife within the intent of the statute").

56.     It does not matter that Rubin purportedly transferred his interest in this action to his wife by transfer of corporate stock, rather than by direct assignment of the underlying "contract."  The statute applies to any predecessor from whom an interested person "derives his interest or title by assignment *or otherwise* . . . ."  CPLR 4519 (emphasis added).  As the Court of Appeals has stated, the form of the "transfer" is irrelevant:

> It matters not by what name it is called; if it operates in law to vest in another party to the action, *or in a person interested in its event*, the title or interest which the witness formerly had, the prohibition remains if it is proposed to use the testimony of the witness in behalf of his successor in interest.

*O'Brien*, 140 N.Y. at 285 (emphasis added); *see also In re Aievoli's Will*, 272 A.D. at 546-47 (same).  Here, Mr. Rubin was the sole owner of AREC from its inception, and claimed to have transferred such sole ownership to his wife while he continued to serve as President.  Assuming that this transfer was valid, Mr. Rubin's wife is indisputably "interested in the event" of this litigation – indeed, as AREC's sole shareholder, she would be the only person "interested in the event" – and she unquestionably derived her interest from Mr. Rubin.  CPLR 4519 thus should have prevented Mr. Rubin from testifying concerning a contract that he purportedly entered into, where he was the person from whom his wife derived her interest.

57.     AREC previously argued that Mr. Rubin's testimony was nevertheless permissible under the Court of Appeals' decision in *Friedrich v. Martin*, 294 N.Y. 588 (1945). In *Martin*, the Court of Appeals held that a witness was not barred from testifying where he transferred all of his stock in the plaintiff corporation to his sister-in-law, such that he was no longer "interested in the event" of the litigation. *Id.* at 594.  The Court held that the witness was not barred from testifying as *his corporation's* predecessor-in-interest because "his corporation . . . had taken nothing from him by assignment or otherwise." *Id.* at 595.  However, the Court of Appeals simply did not consider whether the witness was prohibited from testifying because *his sister-in-law*, by virtue of his assignment, was an interested person, and the witness was the "person from whom" she had derived her interest.

58.     *Martin* is distinguishable in other respects.  In that case, the sister-in-law provided consideration for the transfer in the form of a promissory note, and the witness ceased acting as an officer or director of the corporation.  *Id.* at 594.  Here, by contrast, Mr. Rubin neither required nor received any consideration in return for transferring his 100%-owned corporation to his wife, and Mr. Rubin continued to act as the corporation's president.  Thus, unlike in *Martin*, there are no indications here that Mr. Rubin's transfer to his wife was a *bona fide* transfer for value.

59.     As explained above, a shareholder of a corporate plaintiff is considered an interested party for purposes of CPLR 4519.  Thus, even accepting Mr. Rubin's transfer as valid, his wife is an interested party.  And it matters not that Mr. Rubin's wife is not technically a party to this suit – the statute makes clear that a predecessor-in-interest is prohibited from testifying if he is the person from whom "a party *or interested person* derives his interest . . . ."  CPLR 4519 (emphasis added).  Permitting Mr. Rubin's testimony because his corporation (the sole plaintiff

in this action) did not technically "derive its interest" from him, while ignoring the interest held by his wife, simply and impermissibly reads the phrase "or interested person" out of the statute. *See, e.g., Duncan v. Walker*, 533 U.S. 167, 174 (2001) (noting it is a "cardinal principle of statutory construction" that each clause and word of a statute should be given effect, and not rendered superfluous) (citations and quotations omitted); *Brown v. Wing*, 93 N.Y.2d 517, 523 (1999) (rendering statutory language meaningless is "a transgression of a standard statutory interpretation canon").

**<u>Conclusion</u>**

60.     In sum, for all of the above reasons, AREC's purported oral agreement and Audit Agreement claims fail, and judgment is entered on behalf of Defendants.


 Dated:  New York, New York
         July 9, 2018

                              LOEB & LOEB LLP


                              By:   /s/ *Barry I. Slotnick*
                                   Barry I. Slotnick
                                   Christian D. Carbone
                                   345 Park Avenue
                                   New York, NY 10154
                                   Telephone: 212.407.4000

                                   *Attorneys for Defendants the Estate of*
                                   *Benjamin E. King, p/k/a Ben E. King, by its*
                                   *duly appointed Administrator Terris Cannon,*
                                   *Betty King, Terris Cannon, Benjamin E. King*
                                   *Jr., and Angela Matos*