UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

ARTISTS RIGHTS ENFORCEMENT
CORP.,
                              Plaintiff,

            -v-

THE ESTATE OF BENJAMIN E. KING,
p/k/a BEN E. KING, but its duly appointed
administrator TERRIS CANNON, BETTY
KING, TERRIS CANNON, BENJAMIN
E. KING JR., and ANGELA MATOS,
                              Defendants.

16-CV-1121 (JPO)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

---------------------------------------------------------------

J. PAUL OETKEN, District Judge:

      This is a breach of contract case involving two songs by the late R&B composer and singer Ben E. King: "Stand by Me" and "There Goes My Baby." There are two contracts at issue. The first is an alleged oral agreement between Ben E. King and Charles Rubin, acting on behalf of Plaintiff Artists Rights Enforcement Corp. ("AREC"). AREC alleges that King promised to pay AREC a finder's fee if AREC found a buyer for the royalty streams to the two songs. AREC claims that it found a potential buyer, but that after King died, his family reneged on the deal. AREC seeks $800,000 for its finder's fee. The second contract is a written audit agreement. In that contract, AREC promised to audit a record company's books to recover unpaid royalties owed to King. In exchange, AREC would get a percentage of the money recovered. After King's death, the family terminated this contract. AREC seeks $32,745 for the costs of the audit.

      AREC brings suit against the Estate of Benjamin E. King, by its administrator Terris Cannon (the "King Estate"), as well as Betty King, Terris Cannon, Benjamin E. King Jr., and

1

Angela Matos (the "King Family") (collectively, "Defendants"), seeking damages for breach of these two contracts.[1]

A bench trial was held on May 29–30, 2018.[2] Following the trial, the parties submitted proposed findings of fact and conclusions of law. (Dkt. Nos. 117, 118.)

The Court now issues its findings of fact and conclusions of law.

## I. Findings of Fact

AREC is a New York corporation that assists artists and songwriters in collecting income and selling music-related rights. Charles Rubin ("Rubin") founded AREC in 1977 and served as its president until his death on or about April 15, 2018. Rubin owned all of AREC's stock until June 20, 2016, two days before his deposition in this case, when he transferred the stock to his wife, Marcia Rubin, without consideration.

Ben E. King ("King") was an American singer and songwriter. King co-wrote the compositions "Stand By Me" and "There Goes My Baby" ("the Songs"), both of which were commercially successful hits. King died on April 30, 2015, following a month-long illness. King's interest in "Stand By Me"—that is, his share of the song's copyright and songwriters' royalties—was the most valuable asset in King's estate. King was survived by his wife, Betty King, and three children, Terris Cannon, Benjamin E. King, Jr., and Angela Matos.

---

[1] The operative complaint is at Docket Number 44-1. This Court previously dismissed another claim by AREC against Defendants based on a written sale agreement. *See Artists Rights Enf't Corp. v. Estate of King*, 224 F. Supp. 3d 231, 236 (S.D.N.Y. 2016). The Court subsequently denied reconsideration of that dismissal, but permitted AREC to amend its complaint to add a claim based on the alleged oral agreement at issue here. *See Artists Rights Enf't Corp. v. Estate of King*, 2017 WL 2062988, *3-4 (S.D.N.Y. May 15, 2017).

[2] The transcript of the two-day trial is at Docket Numbers 119 and 121.

2

On July 31, 2014, King and Rubin executed a letter agreement pursuant to which AREC would attempt to sell King's post-termination copyright interests in the Songs in return for ten percent of the amount received in any such sale. That agreement provided that "[AREC] agree[s] that in no event will [AREC] be entitled to receive any portion of [King's] writer royalties . . . ." (PX 1; DX B.)

## A. The Alleged December 2014 Oral Agreement

It is important to distinguish between the two types of rights that a composer like King might be interested in selling: (1) the copyrights to the Songs—that is, the composer's U.S. copyright interests, and (2) King's writer's royalties or "writer's share"—that is, the worldwide royalty income stream for the Songs. These are two separate assets, although they are sometimes sold together. The July 31, 2014 agreement related only to the copyrights to the Songs. This Court held that agreement invalid under the Copyright Act because it purported to transfer future copyright interests before the effective date of King's termination of his prior transfer of the copyrights.[3]

AREC alleges that on or about December 1, 2014 (about four months after the execution of the July 31 written agreement) King and Rubin, on behalf of AREC, reached an oral agreement relating to King's *writer's royalties*. Specifically, AREC contends that the parties agreed to an "oral amendment" of the July 31 contract, under which (1) AREC would seek a buyer for King's writer's royalties to the Songs (separate from the copyrights addressed in the July 31 written agreement), and (2) AREC would receive the same ten-percent fee if Rubin could

---

[3] Shortly after executing the July 31, 2014 agreement, King served termination notices for "There Goes My Baby" and "Stand By Me" with effective dates of August 31, 2016, and April 18, 2017, respectively. *Artists Rights Enf't Corp.*, 224 F. Supp. 3d at 233-34.

3

find a buyer who would pay at least $8 million for *both* the writer's royalties and the copyrights to the Songs. (Dkt. No. 117 ("AREC Findings") ¶¶ 22-30.)

The oral agreement allegedly was reached at a meeting in AREC's offices on or about December 1, 2014. Three people were in the room where it happened: King, Rubin, and Peter Lane, a lawyer for King. Sadly, all three men are now deceased. King died in April 2015; Lane died in September 2015; and Rubin died in April 2018, the month before the trial. Therefore, the only testimony about the alleged oral agreement was from Rubin, and his testimony was by deposition rather than live.[4] Although the lack of live testimony presents a challenge in evaluating the credibility of Rubin as a witness, the Court has reviewed the transcript of his two-day deposition and, with the assistance of other circumstantial evidence, is able to evaluate his testimony.

Rubin testified that, during the December 1, 2014 meeting, he told King that he could sell the writer's royalties from the Songs in addition to the post-termination copyrights for at least $8 million in total. Rubin testified that King responded by saying "Please, go for it." (C. Rubin Dep. 44, 46, 64.) According to Rubin, King also said "Do you think you can get it?" and Rubin replied "Absolutely." (C. Rubin Dep. 65.) No such oral agreement was memorialized or reflected in any written document. Rubin understood and explained to King that he thought he could get $2 million for the copyrights and $6 million for the writer's royalties, for a total of $8 million. (C. Rubin Dep. 118.) In his two days of being deposed, Rubin did not testify that King

---

[4] Defendants filed a pretrial motion in limine based on New York's "dead man's statute," N.Y. C.P.L.R. § 4519, seeking preclusion of any testimony by Rubin about communications with King. (Dkt. Nos. 81-83.) While acknowledging that the motion presented a close question, this Court denied Defendants' motion, thus allowing Rubin's testimony. *Artists Rights Enf't Corp.*, 2018 WL 704990, *4-7. The Court overrules the parties' objections to the deposition designations and counter-designations. The Court has considered the designated deposition testimony to the extent it deems such testimony to be relevant, as discussed in these Findings.

4

had agreed to pay a ten-percent fee for any sale of the writer's royalties alone, although he was asked about the December 1, 2014 meeting several times. However, on August 7, 2017, nearly a month after his deposition, AREC submitted an errata sheet adding a statement that "[King] also agreed to the 10% fee on the sale of the writers' royalties." The Court does not strike this added testimony, but considers it along with the circumstances of its inclusion in assessing the credibility of Rubin's testimony.

During the December 1, 2014 meeting, Rubin and King also discussed entering into two new written contracts: one involving a royalty examination, or audit, of King's music publisher, Sony/ATV (the "Audit Agreement"); and the other involving digital performance royalties from the organization SoundExchange. (C. Rubin Dep. 49-53.) Both of these agreements were signed, written contracts. (PX 2; DX J.)

On December 2, 2014, the day after his meeting with King, Rubin sent an email to Ross Charap, a lawyer, asking him to prepare the written contracts, but not mentioning any oral agreement with King concerning the sale of his writers' royalties. That day, Rubin sent a letter to King, stating that he was "glad we finally met in person about our endeavors to assist you with your termination rights . . . ." (DX H.) Rubin's letter did not mention an alleged agreement regarding the sale of King's writer's royalties.

By March 2015, Rubin was in discussions with Music Sales Corporation, through its executive vice president and chief financial officer, John Castaldo, about a possible sale of interests in the Songs to Music Sales. On March 18, 2015, Rubin attempted to communicate with King by emailing King's daughter, Terris Cannon. In the email, Rubin stated that he had met with Music Sales and had received an oral offer of $9.3 million for the Songs, "[b]oth for

5

U.S. termination and song sale." (PX 7.) However, Castaldo, did not recall making this oral offer. (Tr. 78.) There is no evidence that King responded to the March 18, 2015 email.

On April 2, 2015, King was admitted to the hospital, where he remained until he died on April 30, 2015. On the morning of April 20, 2015, King developed batwing pulmonary edema and required tracheal intubation, meaning that a plastic tube was inserted into his trachea to prevent asphyxiation. From this point until his death, King was heavily sedated, semi-comatose, and unable to communicate.

On or about April 17, 2015, Music Sales made a written offer (dated April 15, 2015) of $8.2 million for the Songs—$6.7 million for King's writer's royalties and $1.5 million for the post-termination copyrights. (PX 6; C. Rubin Dep. 135; Castaldo Decl. ¶ 12.) Although Rubin had requested a formal offer that could be countersigned by King, Castaldo instead made the offer "subject to a written contract and full financial and copyright due diligence." (PX 6.) Castaldo contemplated "two separate contracts": one for the writer's royalties, which could be executed immediately, and the other for the post-termination copyrights, which would be executed "a couple of years" later. (Castaldo Decl. ¶ 9.) The April 15, 2015 letter, however, did not refer to two separate transactions.

On the night of April 20, 2015, Ross Charap, on behalf of AREC, attempted to contact King by emailing Terris Cannon to discuss Music Sales' offer. Charap's email stated that Rubin had told Charap that King had "expressed interest in finding out what your writer royalties might bring if you sold them along with the recaptured shares of" the Songs. The email attached Music Sales' written offer, stating that "Chuck [Rubin] and I believe the reduced offer is just a negotiating ploy to keep the final offer down because Music Sales knows that the audit will drive the price still higher than the first offer." (PX 25.) Given King's condition on April 20, Terris

6

Cannon was not reviewing her emails and did not see this email until after her father died. (Cannon Decl. ¶ 9.)

There is no reliable evidence that Music Sales' April 15, 2015 written offer was communicated to or accepted by King, and the Court finds that it was not. Rubin did not speak with King in April 2015. (C. Rubin Dep. 151-52.) Given King's hospitalization and deteriorating condition, and the fact that King never received Music Sales' offer letter, it is not credible that he accepted the offer. Although Rubin testified vaguely that Peter Lane "approved" the offer on behalf of King (C. Rubin Dep. 179-80), that testimony is not credible.

On April 28, 2015, Rubin, unaware of King's serious condition, emailed Castaldo, seeking to schedule a meeting to "make the sale happen." The meeting was ultimately scheduled for May 5, 2015. (PX 8.) The Court finds that Rubin and King did not contemplate King's presence at the meeting. Rubin was seeking to solicit an increased offer from Music Sales to present to King. Rubin testified that, as of April 28, 2015, Music Sales was willing to offer a total of $9.3 million. (C. Rubin Dep. 379.) Castaldo recalled that at some point between April 15 and April 28 he orally raised his offer to $10 million total ($8 million for the writer's royalties and $2 million for the post-termination copyrights). (Tr. 79; Castaldo Decl. ¶ 15.) Castaldo testified that Music Sales never retracted its $10 million offer. (Castaldo Decl. ¶ 17.) Music Sales made a written offer of $10 million dated January 13, 2016, which was presented in the King Estate proceeding in New Jersey. (Castaldo Decl. ¶ 17.)

The Court finds that Rubin's testimony regarding the formation of the alleged oral agreement is not credible. In light of all the evidence at trial, Rubin's testimony fails to credibly establish the existence of a binding contract.

First, the absence of any documentary evidence supporting the existence of such an oral agreement (or an oral amendment to the July 31 written agreement) is significant. None of the contemporaneous communications refer to such an oral agreement. It is particularly probative that (1) Rubin wrote to King the day after their December 1, 2014 meeting, characterizing the meeting as "about our endeavors to assist you with your termination rights in the copyrights [to the Songs]" (*i.e.*, the subject of the July 31, 2014 written agreement), and not mentioning any new oral agreement (DX H); (2) AREC and King did execute two other agreements on December 15, 2014 (the Audit Agreement and the SoundExchange agreement), making it particularly unlikely that they had also reached another agreement that was never documented (DX J; DX K); and (3) Rubin never told Charap about an oral agreement, including in his communication the day after the December 1 meeting (DX G; Tr. 35-36). It makes little sense that Rubin and King would have documented several agreements in 2014 while failing to document or memorialize an actual agreement covering the *more lucrative* writer's royalties. It makes little sense that Rubin would not have mentioned the oral agreement to AREC's lawyer the day after it allegedly arose, even though he mentioned other agreements. And it makes even less sense that Rubin would *never* have mentioned the oral agreement to AREC's lawyer. In addition, the December 2014 meeting occurred against the backdrop of the July 31, 2014 written agreement, which was then in effect (albeit later deemed invalid) and specifically provided that "in no event will [AREC] be entitled to receive any portion of my writer royalties" from the Songs. (PX 1.) That fact makes it even more implausible that the parties reached a contradictory oral agreement.

Second, there were several contradictions and misstatements in Rubin's testimony, as well as contradictions between his testimony and the complaints filed in this case. These

included contradictions, misstatements, or at least confusing testimony regarding: when and how Rubin communicated Music Sales' offer to King (C. Rubin Tr. 127); Rubin's having called King in mid-April 2015 to discuss Music Sales' offer (C. Rubin Tr. 141-42, 151-52); Rubin's having communicated to King about Music Sales' offer through Charap or Lane (C. Rubin Tr. 370, 391-96); and Rubin's various dealings with Lane, Charap, and Randy Irwin (King's manager). Moreover, when Rubin met with Lisa Alter, counsel to the King Estate, in November 2015 (seven months after King's death), Rubin did not say anything about an alleged oral agreement covering King's writer's royalty—a remarkable omission if such an oral agreement existed. (Alter Decl. ¶ 8.) Indeed, the allegation of an alleged oral agreement did not appear in the original Complaint or the First Amended Complaint, which asserted only a breach of the July 31, 2014 written agreement. The new allegations did not arise until 2017, when the Second Amended Complaint was filed.

Third, Rubin's testimony about the alleged oral agreement was too vague to credibly establish the formation of a binding agreement between AREC and King. Rubin testified that in the December 1, 2014 meeting King said "Please, go for it" (C. Rubin Dep. 44) or "Go get it" (C. Rubin Dep. 116). Even the "it" in Rubin's testimony was less than clear. First Rubin testified that he told King that he could get $8 million for "the songwriter's share," to which King responded, "Please, go for it." (C. Rubin Dep. 44.) Then he clarified that the $8 million was an "estimate" referring to both the post-termination copyright and the writer's royalties. (C. Rubin Dep. 46.) Later he testified, "When I hit the calculator and I told Bennie the number that was possible to get for the songwriter's share, and that's when he said, 'Go get it.'" (C. Rubin Dep. 116.) There was no evidence of a clear understanding between Rubin and King as to whether there was then a deal for the writer's royalties alone, or a deal covering both the writer's royalties

9

and the post-termination copyrights. Moreover, there was no credible evidence that Rubin and King discussed a ten-percent (or any other) fee in connection with an alleged oral agreement on December 1, 2014. And there was no meeting of minds as to other material terms of such an agreement, including the conditions under which any fee would be owed to AREC or Rubin, such as upon the closing of a sale of the writer's royalties. The absence of any agreement about the terms of a fee payment is particularly noteworthy, and stands in contrast to the July 31, 2014 written agreement, which clearly set forth the terms and conditions of payment to AREC under various scenarios, including those in which King would sell or retain his copyright interests. (PX 1.)

The Court finds that there was no oral agreement reached between the parties in December 2014, much less an oral agreement that was sufficiently clear and definite to be binding on the parties.

Even if the Court were to credit Rubin's testimony that he and King reached an understanding or agreement that King would pay AREC a ten-percent fee for any sale of King's writer's royalties, the Court finds as a factual matter that the parties contemplated that any such fee would be contingent on the closing of an actual sale. Assuming that there was a meeting of the minds between King and Rubin in December 2014, it is simply unbelievable, in light of all the evidence, that King would have agreed to bind himself to pay the ten-percent fee in circumstances where there was ultimately no sale.

### B. The Audit Agreement

On or about December 15, 2014, King and AREC executed the Audit Agreement, which related to a royalty audit of the Songs to be performed by an accounting firm, Prager Metis. The audit was intended to ensure that King had received the correct amount of writer's royalties from Sony/ATV, King's music publisher. The parties thought that a finding of an underpayment by

Sony/ATV might raise the price that could be obtained for King's interests in the Songs. (PX 2; Charap Decl. ¶¶ 11-13.)

The Audit Agreement provided:

> [AREC] ha[s] agreed that [AREC] will retain the accounting firm of Prager Metis to perform the audit and shall advance, at [AREC's] sole risk, all of the costs of the audit. That is, these costs are recoupable only and [King] [is] not responsible for any such costs that [AREC] fail[s] to recover from the audit. [AREC] will instruct Prager Metis to perform the audit as soon as possible. . . .
>
> [AREC] ha[s] agreed to perform these services for [King] on a purely contingent basis after recovery of all of [AREC's] recoupable costs; that is, [AREC] shall be entitled to receive thirty three and one third percent (33 1/3%) of the net amount [AREC] [is] able to recover from Sony/ATV based on the audit[.] However, in the event litigation is necessary to resolve the audit, [AREC] shall be entitled to receive fifty percent (50%) of the net amount [AREC] [is] able to recover from Sony/ATV. The term "net amount" shall mean the gross recovery less only [AREC's] recoupable costs.

(PX 2.)

AREC engaged Prager Metis to begin the audit on January 9, 2015. (Tr. 149.) The accounting firm began work on the audit in or about March 2015. Prager Metis did not stop working on the audit after King's death in April 2015. Indeed, the bulk of the audit work—about 75 percent—was performed in July 2015. (Tr. 165.)

On November 2, 2015, Lisa Alter, an attorney for the King Estate and the King family, sent a letter to AREC stating that the King Estate and the King family "do not wish to retain AREC's services as administrator of the [Songs] . . . nor do they wish to engage AREC in connection with the pending audit of Sony/ATV" and that the Audit Agreement is "hereby terminated." (DX GGG.) On November 17, 2015, Alter had a telephone conversation with Chris Hull of Prager Metis, who had been conducting the audit. Hull told Alter that King had potentially been overpaid, rather than underpaid, by Sony/ATV. (Alter Decl. ¶ 6; Tr. 161.) Alter told Hull that the King family was no longer working with AREC and that Prager Metis should

11

cease work on the audit. (Alter Decl. ¶ 6.) She followed up with an email to the same effect. (DX III.) Hull replied to the email, stating that Prager Metis had been retained by "Chuck" (Rubin) to conduct the audit and that the firm would need to take his direction as to how to proceed. (DX JJJ.)

Prager Metis sent AREC an "interim findings" report on March 1, 2016. The report identified potential underpayments to King totaling $47,000. It also identified several areas that it characterized as "not determined," including potential overpayments to King based on foreign-earned royalties, as to which the firm stated that it would need legal direction. (DX LLL.) There is no evidence that AREC pursued the matter with Sony/ATV or recovered any money based on the audit.

AREC ultimately paid Prager Metis $32,745 in fees and costs for the audit—$29,152 in fees and $3,593 in costs. (PX 26, PX 28; DX LLL; Tr. 164, 168.)

## II. Conclusions of Law

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. AREC is a New York corporation with a principal place of business in New York; Defendants are all citizens of New Jersey; and the amount in controversy exceeds $75,000. (Dkt. No. 1 ¶¶ 2, 4-8; Dkt. No. 44-1 ¶ 1; Dkt. No. 68 ¶ 1.)

The parties agree that New York law governs this case. *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (the fact that "the parties agree that New York law controls . . . is sufficient to establish choice of law").

The legal conclusions from the Court's earlier opinions in this case are incorporated in these Conclusions of Law. *See Artists Rights Enf't Corp. v. Estate of King*, 224 F. Supp. 3d 231 (S.D.N.Y. 2016); *Artists Rights Enf't Corp. v. Estate of King*, 2017 WL 2062988 (S.D.N.Y. May

15, 2017); *Artists Rights Enf't Corp. v. Estate of King*, 2018 WL 704990 (S.D.N.Y. Feb. 5, 2018).

Under New York law, the elements of a breach of contract claim are (1) the existence of an agreement between the parties, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages. *Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.*, 333 F. Supp. 3d 307, 311-12 (S.D.N.Y. 2018).

### A. The Alleged December 2014 Oral Agreement

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Oscar Prods., Inc. v. Zacharius*, 893 F. Supp. 250, 255 (S.D.N.Y. 1995). An acceptance "must comply with the terms of the offer and be clear, unambiguous and unequivocal." *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998). "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. New York State DOT*, 93 N.Y.2d 584, 589-90 (1999).

Based on the Findings of Fact set forth above, the Court concludes that AREC has failed to prove by a preponderance of the evidence that King entered into an oral agreement (or oral amendment) on or about December 1, 2014 with AREC (or Rubin) relating to King's writer's royalty interests in the Songs. The Court further concludes that AREC has failed to prove by a preponderance of the evidence that King and AREC (or Rubin) manifested mutual assent as to all material terms of an agreement or intended to be bound by an agreement relating to those interests on or about December 1, 2014.

Because the Court concludes that there was no oral agreement, it is unnecessary to address Defendants' argument that such an agreement would be barred by the statute of frauds pursuant to New York General Obligations Law § 5-701(a)(10).

## B. The Audit Agreement

The Audit Agreement was a written letter agreement, dated December 15, 2014, and signed by King and Rubin on behalf of AREC. The Audit Agreement provided:

> [AREC] ha[s] agreed that [AREC] will retain the accounting firm of Prager Metis to perform the audit and shall advance, at [AREC's] sole risk, all of the costs of the audit. That is, these costs are recoupable only and [King] [is] not responsible for any such costs that [AREC] fail[s] to recover from the audit. [AREC] will instruct Prager Metis to perform the audit as soon as possible. . . .
>
> [AREC] ha[s] agreed to perform these services for [King] on a purely contingent basis after recovery of all of [AREC's] recoupable costs; that is, [AREC] shall be entitled to receive thirty three and one third percent (33 1/3%) of the net amount [AREC] [is] able to recover from Sony/ATV based on the audit[.] However, in the event litigation is necessary to resolve the audit, [AREC] shall be entitled to receive fifty percent (50%) of the net amount [AREC] [is] able to recover from Sony/ATV. The term "net amount" shall mean the gross recovery less only [AREC's] recoupable costs.

(PX 2.)

On November 2, 2015, approximately six months after King's death, Lisa Alter, an attorney for the King Estate and the King family, sent a letter to AREC purporting to terminate the Audit Agreement. (DX GGG.)

With respect to the Audit Agreement, there is no dispute that a valid contract was formed on or about December 15, 2014. However, the parties dispute (1) whether any contractual obligation on King's part survived King's death on April 30, 2014, (2) whether the November 2, 2015 termination was valid and extinguished any surviving obligation on the part of the King Estate, and (3) what, if any, damages are owed to AREC for any breach by the King Estate.

14

The general rule in New York, as in other jurisdictions, is that "in the absence of express words, . . . the parties to a contract intend to bind, not only themselves, but their personal representatives." *Buccini v. Paterno Const. Co.*, 253 N.Y. 256, 259 (1930) (Cardozo, C.J.); *accord Minevitch v. Puleo*, 193 N.Y.S.2d 833, 836 (App. Div. 1st Dep't 1959). This general rule does not apply to "personal services" contracts. *Minevitch*, 193 N.Y.S.2d at 836. Thus, in a master-servant relationship, where "the relation constituted is personal on both sides and contemplates no substitution," the New York courts have long held that a contract will terminate upon the death of either the master or the servant. *Lacy v. Getman*, 119 N.Y. 109, 115 (1890). As the New York Court of Appeals explained over a century ago, "[i]f the master selects the servant, the servant chooses the master. . . . The service, the choice, the contract are personal upon both sides, and more or less dependent upon the individuality of the contracting parties. . . ." *Id.* at 116.

The Court is not persuaded by Defendants' argument that the Audit Agreement is a personal services contract, at least with respect to King's rights and duties under the contract. The personal-services exception to the general rule that contracts survive death is based on the notion of impossibility—that it is impossible to effectuate the parties' intent where the performance contemplated is particular to the individuals involved. *See Lacy*, 119 N.Y. at 115-16; Samuel Williston, A TREATISE ON THE LAW OF CONTRACTS § 77:72 (4th ed. 2004); *see generally* Kirsten Rabe Smolensky, *Rights of the Dead*, 37 HOFSTRA L. REV. 763, 776-77 (2009). Whether a contract is a "personal services" contract essentially turns on "the fact-specific determination of whether the contracted work can be completed by someone else." Kirsten Rabe Smolensky, *Rights of the Dead*, 37 HOFSTRA L. REV. 763, 777 n. 65 (2009) (citing Williston § 77:72). Therefore, "a simple promise to pay money almost always survives the death of the

15

promisor and requires the estate's executor to pay the contracted-for sum." *Id.* at 777. "Where the services to be performed are routine, . . . the contractual obligation is not terminated by death." Williston § 77:72. The Audit Agreement did not require any performance on King's part other than the payment of money—specifically, the payment to AREC of a contingent portion of any money owed to King that is recovered from Sony/ATV as a result of the audit. The Court concludes, therefore, that the Audit Agreement did not automatically terminate with King's death, but survived and passed to the King Estate.

"Under New York law, a contract for services that makes no specific provision for duration is presumed to be terminable at will." *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1062 (2d Cir. 1993). The Audit Agreement does not include any provision for duration or any reference to termination. The Court concludes that the Audit Agreement was terminable at will. The Court further concludes that the Audit Agreement was terminated on November 2, 2015 by Lisa Alter on behalf of the King Estate.

But that conclusion does not necessarily preclude any liability. AREC contends that the King Estate should be held liable under a theory of estoppel or *quantum meruit* for its out-of-pocket costs, at least through November 2, 2015, the date of termination. Defendants respond by emphasizing the plain language of the Audit Agreement, which by its terms clearly did not require *any* affirmative payment by King: it provided that AREC would perform its professional services "on a purely contingent basis," that AREC would "advance, at [its] sole risk, all of the costs of the audit," and that King was "not responsible for any such costs that [AREC] fail[ed] to recover from the results of the audit." (PX 2.)

Notwithstanding the clear language of the Audit Agreement, there is some intuitive appeal to AREC's position. Suppose King had not died in April 2015. Suppose he had allowed

16

AREC to proceed with the audit for a full year, but then abruptly terminated the agreement and offered the same audit-contingency deal to some other party. That would seem to be unfair to AREC: it had paid Prager Metis to conduct the audit in reliance on the potential benefit of a one-third recovery, and it was deprived of that potential benefit. Even in that scenario, however, AREC would not have a claim for promissory estoppel, because such a claim in New York requires "a clear and unambiguous promise" that is relied upon. *See Van Brundt v. Rauschenberg*, 799 F. Supp. 1467, 1473 (S.D.N.Y. 1992). AREC might have a claim for breach of the implied covenant of good faith and fair dealing, which applies to conduct that "has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).

But while the duty of good faith and fair dealing might be implicated by this hypothetical scenario, it is unlikely to apply to the facts of this case. To violate that duty, a party must "so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties." *Id.* The intentions of the parties here are insufficiently clear—including as to the status of the Audit Agreement in the event of King's death—to implicate the duty of good faith and fair dealing. Nor is there any basis for a finding of bad faith on the part of the King Estate. The import of the hypothetical is that there may be equitable or other considerations that impose some form of liability despite the agreement's facially clear language that King was "not responsible for any [audit] costs that [AREC] fail[ed] to recover from the results of the audit." (PX 2.)

The Court concludes that *quantum meruit* is a proper basis for such liability here. In the analogous context of an attorney-client relationship, it is settled New York law that an attorney performing under a contingent-fee agreement that is terminated without cause "is entitled to

recover in *quantum meruit* the fair and reasonable value of his services." *Levy v. Laing*, 843 N.Y.S.2d 542, 544 (App. Div. 1st Dep't 2007); *see also Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004). This doctrine applies even in the absence of an explicit promise of payment and even though a client may freely terminate its agreement with a lawyer at any time. *See Martin v. Camp*, 219 N.Y. 170, 174 (1916). New York courts appear to have awarded recovery in *quantum meruit* in at least some circumstances outside the attorney-client context. *See YCA v. Pistone*, 2002 WL 31415151 (N.Y. App. Term 2002) (tax assessment company recovered in *quantum meruit* where client terminated contingent-fee contract). AREC is entitled to recovery in *quantum meruit* from the King Estate for the fair value of its services under the Audit Agreement. That value is represented by AREC's out-of-pocket costs in paying Prager Metis to carry out the audit.

The value of compensation based on *quantum meruit* is a fixed dollar amount determined as of the time of termination. *Universal Acupuncture*, 370 F.3d at 263–64. Here, the date of termination was November 2, 2015. While the bulk of Prager Metis's work on the audit took place before that date, the firm continued to do work until March 1, 2016. However, there is no clear testimony or other evidence as to when Prager Metis's hourly fees were incurred, other than Hull's testimony that "75 percent" of its work was done in July 2015. Selecting a number higher than 75 percent, as Defendants propose, would require pure speculation on the Court's part. The total amount of Prager Metis's fees paid by AREC was $29,152. (PX 26; Tr. 168.) The Court concludes that AREC has established by a preponderance of the evidence that 75 percent of Prager Metis's fees—that is, $21,864—was incurred as of November 2, 2015.

Because Prager Metis's costs of $3,593 were incurred by November 2015 and paid by AREC (PX 26), that amount is fully recoverable.

Accordingly, AREC is entitled to $25,457 in *quantum meruit* recovery against the King Estate.  AREC is also entitled to prejudgment interest from November 2, 2015, at the New York statutory rate of 9 percent per annum.  N.Y. C.P.L.R. § 5001; *United States Fire Ins. Co. v. Fed. Ins. Co.*, 858 F.2d 882, 887-89 (2d Cir. 1988); *Stillman v.InService Am., Inc.*, 455 F. App'x 48, 51–52 (2d Cir. 2012) ("[P]re-judgment interest on *quantum meruit* claims is mandatory under C.P.L.R. 5001(a).").  Because only the King Estate succeeded to the Audit Agreement by operation of law upon King's death, the other Defendants are not subject to this judgment.

### III. Conclusion

Following the bench trial held on May 29-30, 2018, and on the basis of the foregoing Findings of Fact and Conclusions of Law, it is hereby ORDERED that Plaintiff Artists Rights Enforcement Corporation shall have judgment against Defendant the Estate of Benjamin E. King with respect to the Audit Agreement dated December 15, 2014, in the amount of $25,457, plus prejudgment interest at 9 percent calculated from November 2, 2015 to the date of judgment.

In all other respects, judgment shall be entered in favor of Defendants.

The Clerk of Court shall enter judgment accordingly and close this case.

SO ORDERED.

Dated: March 28, 2019
New York, New York

J. PAUL OETKEN
United States District Judge